WILL OF DERUSSEAU: CRAITE and others, Appellants, vs.
MORNEAU, Respondent.

*September 21—October 18, 1921.*

*Wills: Epileptics: Testamentary capacity: Presumptions: Undue
influence: Fiduciary relation: Evidence: Agreement in con-
sideration of making will: Breach as ground of will contest.*

1. While the fact that a testator was epileptic may be important
   in determining the question of testamentary capacity, neither
   insanity nor testamentary incapacity can be presumed from
   the fact that he had long suffered from epilepsy, where there
   is no proof that he had hallucinations or delusions in the
   intervals between attacks, and where the will was of such a
   character as to be easily understood.
2. Evidence that testator lived in the home of the sole devisee for
   about a month just prior to the execution of his will, the
   devisee being sometimes present with others when the tes-
   tator transacted financial affairs, did not show a fiduciary
   relationship so as to change the ordinary rule as to the burden
   of proof.
3. So, also, evidence that testator lived in the home of the devisee
   for about five years under an agreement to devise his prop-
   erty to him in return for support and medical attention during
   his life, and that the devisee went with him to have the will
   drawn, but was not present when instructions for drawing it
   were given, would not be sufficient proof of undue influence,
   even if the devisee had first suggested that some arrangement
   be made to compensate him for the burden he was to assume.
4. The fact that the devisee, after caring for testator in his home
   for about five years, took him to an insane asylum when it
   became impracticable for him to remain in devisee's house-
   hold, even if it be a breach of contract, is not a ground for
   contesting the will.

APPEAL from a judgment of the circuit court for Barron
county: W. R. FOLEY, Circuit Judge. *Affirmed.*

The appeal is from a judgment of the circuit court affirm-
ing a judgment of the county court admitting to probate an
instrument purporting to be the last will and testament of
John Derusseau, deceased.

The will in question was executed on April 29, 1912, the

respondent being named sole beneficiary and the appellants, brothers and sisters of the deceased, being expressly excluded. At the same time a contract was entered into between the respondent and the deceased whereby the respondent, in consideration of $15 a month and his being named sole beneficiary, agreed to take the deceased into his home and provide food, clothing, and medical attention for him during his life and care for him as he would for one of his own infant sons.

The deceased lived at the home of the respondent from the early part of April, 1912, until his removal to the Eau Claire insane asylum, after an application by the respondent in January, 1917. In October, 1917, a brother-in-law secured his release and took him to Rice Lake. He returned him soon after to the asylum, but in December, 1917, he again secured his release and arranged for his care in a Catholic sisters home in Dubuque, Iowa, at which place he died in August, 1918, at the age of thirty-nine years.

The deceased had suffered from epileptic fits since early childhood. Because of this affliction relatives as well as strangers were reluctant to have him in their families. As a consequence, since the death of his mother in 1902 he had lived at various places for short terms, sometimes with relatives, sometimes on the farms of neighbors as a farm-hand, and a few seasons in the woods with logging crews. For approximately two years previous to the making of the will and contract he had been employed on the farm of one of his brothers-in-law, John Dorsey, at whose request he was taken to the home of the respondent.

The heirs at law objected to the probate of the instrument in question as the will of the deceased on the ground that it had been procured by undue influence and that at the time of its execution the deceased was of unsound mind and not possessed of sufficient mental capacity to make a will.

There was testimony to the effect that E. Craite, a brother-in-law, acted on various occasions as business adviser of the

deceased, and this witness claims to have influenced him to make certain deals, as well as to have attended to the details. There was testimony to the effect that the respondent was nearly always present when any money was paid to the deceased. Several of the brothers and sisters stated that the deceased talked and acted queerly and foolishly; that he was very forgetful, and sometimes forgot when he had lent money; that he could not be trusted to do certain tasks because of this forgetfulness; that he could not carry on a connected conversation except at rare intervals; that no one seemed to like to talk to him or be in his company; that some of his relatives were afraid of him; and that at school he was not able to learn. Mr. Craite testified that the deceased had told him in 1917 and after he had returned from the asylum that he had never made a will; that although he had made arrangements with the respondent he wanted the others to have equal shares. Most of the testimony as to the eccentric conduct and conversation of deceased was given by relatives interested in breaking the will.

The respondent called several witnesses who testified that they had had business transactions with the deceased in which he acted like any one else and always seemed to be able to look after his interests. Numerous witnesses for proponent testified that they noticed nothing unusual in his talk or actions except when he had the seizures; that he did not talk or act foolishly except at such times; and that when well he was a good worker and could be trusted. Mr. Whittaker, a notary public who conducted an abstract office, testified to numerous business transactions with him as to drawing satisfactions, mortgage assignments, and deeds. Sometimes he would go to the office alone, sometimes with others. These transactions continued from 1901 to 1912. Mr. Whittaker's evidence was that testator was keen in business matters. Other disinterested witnesses gave similar testimony as to his business transactions.

Other facts will be stated in the opinion.

Will of Derusseau, 175 Wis. 140.

For the appellants the cause was submitted on the brief of *M. S. Hines* of Rice Lake.

*Arthur E. Coe* of Barron, for the respondent.

JONES, J. If it were not for the testimony that the deceased had suffered from epilepsy since childhood, the facts in this case would call for very little discussion.

The testimony given by relatives as to the peculiarities, forgetfulness, lack of reliability, and foolishness in conversation which they attributed to the deceased was far outweighed by evidence given by disinterested witnesses concerning his general intelligence and especially his ability to attend to his business affairs. Except for an item of evidence by one of his relatives that he had forgotten a small loan he had made, there is no testimony of any unwise business transactions. On the contrary, the evidence shows that by his industry and frugality, notwithstanding the untoward conditions of his life, he had increased his small inheritance from $2,000 to $3,500. In a small way he had become a capitalist and had invested and reinvested his money with at least average prudence. It is true that sometimes Mr. Craite, his brother-in-law, had advised with him in these transactions, but at other times he went to the conveyancer alone, and seemed to exercise ordinary business judgment, and was "keen enough to get seven per cent. when he could."

It is strongly urged by the appellants, however, that any preponderance of the testimony as to the general business capacity of the deceased is overcome by the fact that he had been an epileptic since infancy. There was testimony that he sometimes had these seizures once or twice a day, sometimes once or twice a month, that sometimes he would be unconscious for an hour, sometimes for a day. Dr. Wallis, witness for contestants, testified that the disease is a progressive one "in which the seizures become more intense and more frequent until death occurs, which usually does

eventually, and during this time the mind is in a progressive state of deterioration," and that the epileptic seizure is followed by mental derangement of some degree which may last from a few hours to a few days. The doctor further testified: "It's a mental disease, because it is a progressive mental disease in which the mentality of the patient deteriorates from the minute of the first seizure in direct proportion to the intensity and the frequency of the attacks, until the mind is lost or death ensues, or the patient is cured. Those are the three conditions."

Contestants' counsel rely largely upon this testimony and upon the fact that deceased was committed to the insane asylum as evidence tending to establish his testamentary incapacity when the will was made. This commitment was made four years and eight months after the execution of the will. There was a little testimony to the effect that his mental condition was not very different at the time of the commitment from the condition when the will was made. The evidence is clear, however, that the seizures had become more violent at the later period, and he died about seventeen months after the commitment.

The testimony convinces us that the mental and physical condition of the testator had greatly changed in the interval between the execution of the will and the commitment to the insane asylum. We have been surprised to find that the effect of epilepsy upon testamentary capacity has been so seldom passed upon by the courts of last resort. Only one such case is cited in the briefs of counsel, to wit, *Lewis's Will*, 51 Wis. 101, 7 N. W. 829. In that case the general testimony showing peculiarities and weakness of mind of the testator was more weighty than in the instant case. In that case the testator was about sixty years of age when the will was executed. He had been absent from Wisconsin for several years and returned to the state for the purpose of selling his land. The will bore date March 12th.

On the day before he had been seized with a fit and became unconscious. There was another seizure within about five minutes after the execution of the will, and on the 14th of March he died. In an opinion by Mr. Justice LYON the will was sustained, and it is stated, "It is doubtless within the knowledge of almost every person of ordinary intelligence that the victims of that malady frequently retain their mental faculties fully to the moment of attack, especially in the earlier stages of the malady."

In the present case there is no proof of any seizure for some weeks before or after the execution of the will. The testimony shows that the testator first went to his notary public and then to Mr. Coe, who prepared the will, and on both occasions, in their judgment, seemed in a normal frame of mind. Undoubtedly he had long been the victim of a deplorable mental disease and there had probably been some impairment of his mental powers before the execution of the will. From the answers filled in by the medical examiners when the testator was adjudged insane, it is argued by proponent's counsel that he was not then insane, but it is unnecessary to decide this question. Presumptions are not generally retrospective, and even if he was insane at the time of the commitment it does not follow that he was insane four years and eight months before. Neither insanity nor testamentary incapacity can be presumed from the fact that a testator has long suffered from epilepsy. It is true that such a condition may be an important fact in connection with other facts in the determination of the question, but it is a matter of common knowledge that many persons have long been the victims of this dread disease and yet possessed in the intervals between attacks a high degree of mental power. In Ray's Medical Jurisprudence of Insanity it is said, page 477:

"Zacchias contends that epileptics should not be responsible for any acts committed within three days of a fit, before or

after.    The principle is undoubtedly sound as it regards criminal acts; and certainly civil acts performed within two or three days after a fit deserve to be closely scrutinized. Not infrequently, however, the intellect may be as clear and strong as usual up to the very moment of an attack, and therefore it would seem as if other and satisfactory reasons should be required for invalidating transactions executed under such circumstances."

It cannot be said that because a person is an epileptic he is therefore insane.  *Will of Rapplee,* 66 Hun, 558, 21 N. Y. Supp. 801; *Johnson's Will,* 7 Misc. 220, 27 N. Y. Supp. 649; *Estate of Jansa,* 169 Wis. 220, 171 N. W. 947.

There is no testimony that the testator had hallucinations or delusions in the intervals between attacks.  Neither the will nor the accompanying agreement was so complicated as not to be easily understood.  We are convinced from the whole testimony, including that relating to epilepsy, that the testator had sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were or should or might have been the objects of his bounty, and the scope and bearing of the provisions of his will, and that he had sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them.  We therefore hold with the county judge and the circuit judge that the testator was competent to execute the will in question.

It is strongly urged by contestants that the will was obtained by undue influence.  As the basis of their argument it is urged that the proponent of the will sustained a fiduciary relation toward the testator.  There is no evidence that the proponent had been the trusted agent of the deceased prior to the execution of the will.  On the contrary the evidence shows that Mr. Craite, husband of one of the contestants, had been much more active than the proponent

in assisting the testator in his business affairs. Apparently there had been no greater intimacy between John Derusseau and *Morneau* than had existed with other relatives. It is true the deceased had at times lived with *Mr.* and Mrs. *Morneau,* but he had also at times lived with other members of his family. Any inference of a fiduciary relationship must rest upon the bare facts of the relationship and residence in the same household with the proponent for about a month just prior to the execution of the will. We do not consider that the evidence shows any such fiduciary relation before or at the time of the execution of the will as to change the ordinary rule as to the burden of proof.

As furnishing one of the elements of undue influence it is argued that the other relatives were not informed of the execution of the will. As bearing on this subject it is an important fact that the testator had offered to make a similar arrangement by will to his sister *Mrs. Craite* if she would agree to support him, and that she had rejected the offer. His plan of disposing of his property thus became known to one of his sisters and perhaps it is fair to assume that it became known to the others. We do not believe that under the circumstances it became the duty of the respondent to discuss the subject with other members of the family.

It is urged that the deceased was one easily subject to undue influence by others. This subject is partly covered by the foregoing discussion as to his competency. There is a singular lack of testimony that he had been influenced against his will by *John Morneau* or any one else. The evidence that Mr. Craite had in one or two instances given advice which had been followed is the only evidence bearing on the subject.

It is urged that *John Morneau* showed a disposition to gain an undue advantage and that he had the opportunity for so doing. Unless the will and the agreement afford such evidence there is nothing to support this contention. There

is no evidence of any importunity on his part nor that he in any way took any advantage in his business dealings with the testator.

It is true that when the testator went to Mr. Whittaker and asked him to draw a will proponent went with him and heard the conversation. Mr. Whittaker had long known that the testator had epileptic seizures and for that reason advised him to go to a lawyer who would understand the subject better. When he went to Mr. Coe the proponent was not present during the interview in which the instructions were given. Mr. Coe had known the deceased for years and was aware of his affliction. He therefore took unusual care to ascertain whether there was testamentary capacity. He testified as follows:

"I did something on that occasion that I never did before and I never have done since. I made an effort, by examining this man John Derusseau as to his past history and his relatives and his property, to test his mental capacity, and to that end I went with him to the county judge's office— Judge MEADOWS was county judge—and I asked him a lot of questions in Judge MEADOWS's presence as to his history and his previous life, and after hearing his answers I returned to the office with him and then drew his will. And from his answers, upon his answers, I base my statement that he was at the time he executed his will of sound and disposing mind and memory."

At this interview in the presence of the county judge the proponent was not present.

It is urged by counsel that the will and accompanying agreement are evidence of undue influence; that it was unnatural and unfair to exclude all other relatives and to make *John Morneau* the sole beneficiary under the will. The testator was profoundly conscious of his sad condition and knew that he could not be a welcome inmate in the households of his brothers and sisters. His sister *Mrs. Dorsey* had requested that the *Morneaus* take him into their home.

*Mrs. Craite* went with the testator to her sister Mrs. Morneau and asked her to take care of him. We do not agree that it was unnatural for John Derusseau, under those circumstances, to make some provision with his little property by which his deplorable condition could be to some extent. ameliorated, and we do not think that testamentary provisions of this character should be lightly set aside.

Under the circumstances, even if *John Morneau* had first suggested and requested that some arrangement be made by which he should be compensated for the burden he was to assume, that would not be sufficient proof of undue influence; but it is evident that the idea of some such provision had been entertained by the testator before he went to the home of *Morneau*. The testimony shows that the other relatives of the deceased had no peculiar claim upon his bounty. Mr. Craite testified that they were "financiers living off the interest of their money; they are not farmers; got money to live. They live in the city and are retired farmers. They are not business men."

It is argued that *Morneau* breached his contract by taking the testator to the insane asylum. He had borne the burden and responsibility of kindly caring for his brother-in-law for four years and eight months. The time then came when it was no longer practicable that he should remain in the household. *Morneau's* own son then had epileptic seizures which greatly complicated the situation.

We are satisfied with the finding of the trial judge that the will was not obtained by undue influence. Even if *John Morneau* did breach his agreement nearly five years afterward, that would not be ground for a contest of the will.

*By the Court.*—Judgment affirmed.