## WATSON et al. v. JACKSON. (No. 3358.)

Court of Civil Appeals of Texas. Texarkana.
April 14, 1927.

Rehearing Denied April 28, 1927.

1. **Deeds ⬤⇒211(1)—Evidence held not to support verdict that grantor afflicted with epilepsy was incapable of executing deed.**

Evidence *held* not to support verdict that grantor was mentally incapable of executing deed, though afflicted with epilepsy and mentally unbalanced at times.

2. **Deeds ⬤⇒196(1)—Burden is on one contesting deed to prove grantor's mental incapacity.**

Burden is on one contesting deed on ground that grantor was mentally incapable of executing it to prove his mental incapacity.

3. **Deeds ⬤⇒211(1)—Evidence that grantor sometimes lacked mental capacity requisite to executing deeds is insufficient to invalidate deed without proof that incapacity was continuous or existed at time deed was actually signed.**

Inference that a grantor is mentally incapable of binding himself at time of executing a deed cannot be drawn from testimony showing he lacked such capacity at other times, unless it appears that such incapacity was in its nature permanent and continuous, and hence evidence merely showing temporary incapacity at other times is insufficient to invalidate deed.

Appeal from District Court, Delta County; J. M. Melson, Judge.

Suit by J. C. Jackson, by his next friend, F. B. Jackson, against J. P. Watson and others to cancel a deed. Judgment for plaintiff, and defendants appeal. Reversed and rendered.

By a deed dated November 29, 1900, John W. Jackson and his wife, C. V. Jackson, conveyed 42.74 acres of the Z. Birdwell survey in Delta county to their son J. C. Jackson. According to recitals in the deed, the consideration thereof was $1 and "natural love and affection" the grantors had for the grantee, and said C. V. Jackson was to "have the use and benefit of said land to the extent of support during the remainder of her natural life, and at her death said conveyance to become absolute." By a deed dated July 16, 1902, said J. C. Jackson conveyed the land to H. B. Pearson; the consideration for the conveyance, as recited, being $1,037.50 and certain notes secured by a vendor's lien retained on the land. By a deed dated September 24, 1902, said Pearson reconveyed the land to said J. C. Jackson; the consideration being, as recited, $1,037.50 and the assumption of the payment of the promissory notes made by Pearson, referred to above. By a deed dated December 5, 1910, said Pearson undertook to convey the land to said C. V. Jackson; the consideration being, as recited, $1 paid to him and "the further consideration that said C. V. Jackson assume the payment of three certain vendor's lien notes executed by H. B. Pearson to J. C. Jackson or his order, and all accrued interest on same." By a deed dated December 26, 1910, said C. V. Jackson undertook to convey the land to G. N. White and B. F. Clark; the consideration being, as recited, $750 cash and three promissory notes for $250 each, payable to said C. V. Jackson or order. By a deed dated September 13, 1911, said Clark conveyed his interest in the land to said White. By a deed dated February 8, 1912, J. C. Jackson undertook to convey the land to C. V. Jackson; the consideration being, as recited, $5 paid "and the further consideration of the love and affection that I have for my mother, the said C. V. Jackson; and the further consideration that she originally owned and held a life interest in the hereinafter described land until she sold the same, and the further consideration that she afterwards bought the said land and paid for the same, and also paid off certain indebtedness against the same, to wit, the notes given by H. B. Pearson to me; and the further consideration that she has since then sold and warranted the title to the said land; and I desire to perfect the title to the said land in my said mother, and to protect her on her said warranty of the title to said land." By a deed dated December 24, 1917, said G. N. White undertook to convey the land to J. P. Watson; the consideration being, as recited, $750 paid, Watson's promissory notes for sums aggregating $2,357, and his undertaking to pay "the sum of $1,177 now outstanding against the land." By a deed dated November 1, 1921, said Watson and his wife, Edna Watson, undertook to convey the land to J. E. McPherson, as trustee, to secure the payment of a promissory note for $1,167 made by him (Watson) to a bank, and four other promissory notes for $250 each made by him to said G. N. White, held by C. A. Larson and the Maxwell Investment Company, a corporation, and afterwards transferred, it seems, to the Central Life Assurance Society, also a corporation. This suit, commenced September 9, 1924, by J. C. Jackson, by his next friend, F. B. Jackson, as plaintiff, against C. A. Larson and said J. P. Watson, Edna Watson, G. N. White, B. F. Clark, Maxwell Investment Company, and Central Life Assurance Society, as defendants, was to cancel said deed from said J. C. Jackson to said C. V. Jackson, dated February 8, 1912, on the ground that said J. C. Jackson at the time he undertook to execute same was "an insane person (quoting) or a non compos mentis incapable of transacting the ordinary affairs of life or exercising his judgment or will in transacting business matters." The plaintiff by his suit also sought a cancellation of others of the deeds above referred to, as well as of promissory notes men-

---

⬤⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

tioned, and also sought a recovery of rents on the land for the years 1918 to 1923, inclusive.

It seems from testimony heard at the trial that in a fight appellee engaged in when he was 16 or 17 years of age some one hit him on the head with a billiard cue, and that afterwards, and to the time of the trial, he suffered from epilepsy. He and the witness Mary Branham were married in March, 1898, when she was 17 years of age and he was 10 or 12 years older. Mrs. Branham testified that she and appellee lived together until 1906, when he was sent to the State Epileptic Colony at Abilene, where he afterward remained. She was divorced from him in 1909 and never saw him between the time when he was sent to said colony and the time of the trial, except for about one hour in 1907, when he visited his home in Delta county. She testified that the first she knew of appellee's being an epileptic was when he had a fit about three weeks after they were married. Afterwards, she said, he had fits as often as every ten days or two weeks, and she had known him to have as many as four in one week. The "spells" increased in frequency and laster longer, she said, as time passed. She had known one of them to last as long as three days, she said. Appellee smoked cigarettes "all the time," she said, and drank intoxicating liquor—"would get drunk every three or four weeks." Describing conduct of appellee while she lived with him, Mrs. Branham said he would move the furniture from one place to another in the house when there was no reason for doing so; would wander around the yard all day and pick up worthless articles which he said should be taken care of; would leave home, without saying anything to any one about his intention to do so, and sometimes stay away as long as two or three weeks, and when he returned act "as unconcerned as if he had not been anywhere at all, just as though he had been around the place all the time"; on one occasion hitched his horse to a buggy and drove to Honey Grove and came back home on a railway train, unconscious of the fact that he had gone there in the buggy and left it and the horse there unattended to; on another occassion dressed completely, except he left off his pants, to go somewhere, and left home without his pants, when she followed him in a buggy and took him back home "just as unconcerned as if he was fully dressed"; on other occasions, when plowing, would drop his plow lines, and, leaving his team hitched to the cultivator, would get his horse and go to town; would take a notion to move from where they were living with his father and mother, and, without saying anything to any one, get a wagon and begin loading things on it and move them to a small vacant house on his father's place; in about three weeks would move back to his father's home and never mention about having moved away; on one occasion he went to the cow lot, caught the cow, put a bridle and saddle on her, and declared he was going to town, "just as unconcerned as if he was riding a horse"; was "always hunting and uneasy about something"; would pick up waste paper, count things, flies for instance, and on one occasion got a comb and brush hanging on the wall, placed same under a box, and asked the witness to sit and watch them because they were valuable and he did not want any one to get them. At times, Mrs. Branham said, appellee would declare he was "going to clean up things," and would "take the poker or anything and wave it around over the house"; would get his gun and shoot up through the ceiling of the house, and on one occasion shot at his father and at witness' foot; had the shooting spells about every two months. While witness and appellee were temporarily at Fort Worth, appellee, without her knowledge, took their son, then about four years old, to a railway depot and left him asleep behind a barrel, where she afterwards found him; and on another occasion, without telling her he meant to do so, took the boy away from their home and kept him all night. The witness said she never knew appellee to do a day's work, but also testified that he worked for about six weeks at a nursery, where he was paid $3 a day. However, she said the work he did there was gathering beans and other vegetables, which he was supposed to sort out, but which he mixed together and she had to separate same. Mrs. Branham testified further that appellee on one ocasion whipped their son with a rope, and had slapped her jaws "and such as that." Appellee was finally taken into custody by their neighbors, the witness said, and was confined in jail until he was sent to said colony at Abilene. In jail he refused to eat until he accumulated a great quantity of food, and then would "eat like a hog." He paid no attention to witness nor their son when they visited him in the jail, and in 1907 when she and their son were with him about an hour. On the facts stated by her and knowledge she acquired while she lived with appellee, Mrs. Branham was of the opinion, she testified, that he was of unsound mind when he executed the deed to his mother, C. V. Jackson, February 8, 1912, and was not then "mentally capable (quoting) to know and understand and appreciate his property rights."

Six or seven other persons who knew appellee before he was sent to Abilene, in 1906, testified to conduct of his similar to that detailed by Mrs. Branham, and said they, too, were of the opinion appellee on said February 8, 1912, was not mentally capable of transacting business of any kind; and this opinion was concurred in by three or four physicians who testified in reply to hypothetical questions propounded to them. Some of the witnesses who testified as experts had never seen appellee, and none of the witnesses (except Dr. T. B. Bass) who testified as to his mental condition ever saw him after he was sent to Abilene in

1906, except for a few days in the fall of 1911, when he visited his home in Delta county. Dr. T. B. Bass, above referred to, was the superintendent of the State Epileptic Colony at Abilene and had known and treated appellee from the time he became an inmate of the colony to the time of the trial. Dr. Bass testified by deposition. He said appellee's mental condition on February 8, 1912, the day he executed the deed to his mother, C. V. Jackson, was good. In reply to cross-interrogatories propounded to him by appellee, Dr. Bass testified as follows:

"I saw or examined J. C. Jackson about twice a day while he was in the colony from April, 1906, to February, 1909, and from 1909 to 1912 not so often, sometimes every day and sometimes not so often. From 1906 to February 8, 1912, J. C. Jackson would sometimes have several fits a day, sometimes he would go several weeks or longer without having an epileptic fit. Sometimes he had hard convulsions and would go to sleep. Sometimes in dazed condition a short time after; sometimes he would be a maniac for several days. His mind is bad now. Usually, however, he is rational and will answer questions intelligently and remembers things very well. His mind is not as good now as it was sometimes in 1906. His physical condition is fair at this time. His physical condition is sometimes better, sometimes worse. J. C. Jackson escaped from the colony about five or six times from 1906 to February 8, 1912. I don't think J. C. Jackson escaped from the colony in the year of 1911. It is a fact that during the period from 1906 to Feburary 8, 1912, that J. C. Jackson was brought back to the colony by sheriffs and other peace officers. Yes, in probably 1909 or 1910 J. C. Jackson was brought back to the colony by a guard, that he undertook to escape from said officers, and that it became necessary, or they did, shoot at or near him before getting him under control. J. C. Jackson discussed this business transaction with me of executing said deed of conveyance to 43 acres of land. My recollection is that he did go to town to sign the deed. He was permitted to go to town, to execute this deed. I remember that some one came to the colony to get him to sign the deed, and he talked to me about his condition and capability of signing a deed. He has frequently written letters since he has been at the colony, and has picked cotton for money and has spent it as he saw fit. There were frequent times all along from 1906 to February 8, 1912, when J. C. Jackson was incapable a good portion of the time of transacting important business matters and understanding the nature and consequences of his act. It is not a fact that the said J. C. Jackson has been mentally incapable of executing a deed of conveyance to land and understanding its nature, effects, and consequences practically all of the time since 1912. Epilepsy has its individuality. Many very smart people have epilepsy. Some have it for years without any deterioration of mind. Some lose consciousness for a few minutes and mind is all right soon after. Some are mentally disturbed for quite a while before and after having a fit. Some minds clear up after having a fit. Some have frequent spells of mania. Most cases who have frequent seizures tend to dementia. The disease of epilepsy is frequently accompanied by mental derangement. Sometimes persons suffering from epilepsy and frequent epileptic fits over a long period of years becomes incapable mentally of transacting important business and understanding its nature and consequences. I think epileptics are more likely to become insane than any other class of people."

Other witnesses (as many or more than testified for appellee that his mind was unsound, and having as good an opportunity to know the fact) testified for appellants that they thought appellee was mentally capable of transacting ordinary business. After appellee executed said deed of February 8, 1912, to his mother, C. V. Jackson (who died January 2, 1923), he wrote her a letter in which (according to the testimony of his brother, T. A. Jackson) he "said something about being glad she had got something out of the place," and May 5, 1919, he wrote her a letter as follows:

"Abilene, Tex., May 5, 1919.

"Dear Mother: I received your letter yesterday, was glad to hear from you all and to hear you all was well. I am glad to hear corn is looking fine and that cotton is coming up; I hope crops will be good. We have had good rains out here; I have not seen any crops out here; I do not leave the colony. I am glad to hear Clemmie has married a nice boy. I hope you will hear from Uncle Harry often as you wish; I have not got a letter from him in a long time; I do wish to hear from him and all the rest. I do wish to see him and all the rest. I hope I will be well and with you all soon. I do not think of any more to write, so I will close for this time. I hope I will be well and with you all soon. I hope this will find you all well. May I hear from you all soon.

"Your son as ever, J. C. Jackson."

On special issues submitted to them, the jury found as follows:

(1) That at the time appellee executed the deed of February 8, 1912, to his mother, C. V. Jackson, he did not have "sufficient mental capacity," as that term had been defined by the court, to execute same.

(2) That appellee never had such capacity at any time after he executed said deed.

(3) That the value of the land in controversy was enhanced $650 in value by improvements on it made by White and Clark.

(4) That value of said land was enhanced $150 in value by improvements on it made by Watson.

(5) That the rental value of the land was $300 in 1923, and $300 in 1924.

The appeal is from a judgment as follows: (1) Canceling the deed of February 8, 1912, made by appellee to his mother, C. V. Jackson. (2) Canceling the deed of C. V. Jackson to White and Clark, the deed of Clark to White, the deed of White to Watson, the deed of trust to the Maxwell Investment Company, and the vendor's lien in favor of C. A. Larson, so far as same affected the title of appellee to

the land. (3) In favor of appellee for the land in controversy, and against Watson for $450 as rents. (4) In favor of attorneys representing appellee for an undivided interest of 40 per cent., in the money and land adjudged to appellee. (5) In favor of the Central Life Assurance Society as follows on its cross-action: Against Clark for $1,192, against White for $2,270, and against Larson for $2,270, with a proviso that the judgment so far as it was against Watson should be credited with any sum collected of Clark and White.

L. L. James, of Greenville, Rube S. Wells, of Cooper, and Coker, Carter & Wilson, of Dallas, for appellants.

Vinson, Elkins, Sweeton & Weems and C. A. Sweeton, all of Houston, and Joel H. Berry and Chas. D. Berry, both of Cooper, for appellee.

WILLSON, C. J. (after stating the facts as above). [1] Careful consideration of the evidence in the statement of facts sent to this court has convinced us that it did not warrant a finding that appellee was without mental capacity to make the deed to his mother in question, and that the trial court therefore erred when he refused appellant's request that he instruct the jury to return a verdict in their favor.

[2] The burden was on appellee to prove such mental incapacity, and we think he wholly failed to discharge it. There was evidence that the kind of epilepsy from which appellee had suffered 20 or more years was incurable, and that its effect was to gradually weaken and finally destroy the mind of its victim; but there was no testimony of probative force showing that in appellee's case mental incapacity wrought by the malady had progressed so far that he was at all times incapable of binding himself by such a contract as the one in question. The testimony was that before appellee executed the deed such incapacity existed only during the time he was in the throes of a fit and while recovering from one; and there was no testimony showing he was suffering from a fit or the effects of one at the time he executed the deed. The only direct testimony on that point was that of Dr. Bass, the superintendent of the epileptic colony, and it was that appellee was not then suffering from the effects of an epileptic fit.

[3] As we understand the rule applicable, an inference that a grantor was mentally incapable of binding himself at the time he executed a deed cannot be drawn from testimony showing he lacked such capacity at other and different times, unless it appears that such incapacity at such other and different times was in its nature permanent and continuous. Where, as in this case, incapacity existed only at times and the grantor at other times did not lack mental capacity, a presumption of incapacity at a particular time cannot be indulged, and to support a judgment invalidating the grantor's deed there must be evidence of probative force tending to show that he was mentally incapable of binding himself by a contract at the very time he executed the deed. It has often been held that "neither insanity nor testamentary incapacity can be presumed from the fact that a testator has long suffered from epilepsy." Re Will of Derusseau, 175 Wis. 140, 184 N. W. 705, 16 A. L. R. 1412, and note at page 1418; and see, as authorities more or less directly supporting what is said above, Caddell v. Caddell, 62 Tex. Civ. App. 461, 131 S. W. 432; Armstrong v. Burt (Tex. Civ. App.) 138 S. W 172; Furlong v. Tilley, 51 Utah, 617, 172 P. 676; 13 C. J. 262; 18 C. J. 218, 221, 428, 443; 22 C. J. 146; 32 C. J. 760; 1 Elliott on Contracts, § 366; 1 Alexander on Wills, §§ 356, 357; Goldberg v. Homestead Co., 78 N. J. Law, 70, 73 A. 128; State v. Kelly, 77 Conn. 266, 58 A. 705.

The judgment is reversed, and judgment will be rendered here in favor of appellants.