**JACKSON v. WATSON et al.   (No. 836–4898.)**

Commission of Appeals of Texas, Section B. Nov. 28, 1928.

Vinson, Elkins, Sweeton & Weems, C. A. Sweeton, and Joel H. Berry, all of Houston,

and Charles D. Berry, of Cooper, for plaintiff in error.

L. L. James, of Greenville, and Coker & Wilson, of Dallas, for defendants in error.

LEDDY, J. On February 8, 1912, J. C. Jackson executed a deed by which he conveyed to C. V. Jackson 42.74 acres of land situated in Delta county, Tex. This suit was brought by F. B. Jackson, as next friend of J. C. Jackson, to set aside such deed and subsequent conveyances made thereunder, on the ground that at the time of the execution of such deed Jackson was mentally incompetent.

Based upon favorable findings of the jury, in the answer to special issues, the trial court rendered judgment canceling said deed and subsequent conveyances made thereunder, and also adjudicated the question of rents and improvements, in accordance with the findings of the jury. Upon appeal the Court of Civil Appeals reversed the judgment of the trial court, and rendered judgment in favor of defendants in error; the basis of such reversal being that there was no evidence of probative force tending to show that Jackson was mentally incapable of binding himself by contract at the very time he executed the deed (294 S. W. 328).

A great deal of testimony was introduced concerning Jackson's mental condition before and after the execution of the deed in question, some nine lay witnesses and four physicians testifying as to his mental condition. We quote the following from the statement of the case made by the Court of Civil Appeals, which fairly summarizes the evidence on this issue offered by plaintiff in error:

"It seems from testimony heard at the trial that in a fight appellee engaged in when he was 16 or 17 years of age some one hit him on the head with a billiard cue, and that afterwards, and to the time of the trial, he suffered from epilepsy. He and the witness Mary Branham were married in March, 1898, when she was 17 years of age and he was 10 or 12 years older. Mrs. Branham testified that she and appellee lived together until 1906, when he was sent to the State Epileptic Colony at Abilene, where he afterward remained. She was divorced from him in 1909 and never saw him between the time when he was sent to said colony and the time of the trial, except for about one hour in 1907, when he visited his home in Delta county. She testified that the first she knew of appellee's being an epileptic was when he had a fit about three weeks after they were married. Afterwards, she said, he had fits as often as every ten days or two weeks, and she had known him to have as many as four in one week. The 'spells' increased in frequency and lasted longer, she said, as time passed. She had known one of them to last as long as three days, she said. Appellee smoked cigarettes 'all the time,' she said, and drank intoxicating liquor— 'would get drunk every three or four weeks.' Describing conduct of appellee while she lived with him, Mrs. Branham said he would move

the furniture from one place to another in the house when there was no reason for doing so; would wander around the yard all day and pick up worthless articles which he said should be taken care of; would leave home, without saying anything to any one about his intention to do so, and sometimes stay away as long as two or three weeks, and when he returned act 'as unconcerned as if he had not been anywhere at all, just as though he had been around the place all the time'; on one occasion hitched his horse to a buggy and drove to Honey Grove and came back home on a railway train, unconscious of the fact that he had gone there in the buggy and left it and the horse there unattended to; on another occasion dressed completely, except he left off his pants, to go somewhere, and left home without his pants, when she followed him in a buggy and took him back home 'just as unconcerned as if he was fully dressed;' on other occasions, when plowing, would drop his plow lines, and leaving his team hitched to the cultivator, would get his horse and go to town; would take a notion to move from where they were living with his father and mother, and, without saying anything to any one, get a wagon and begin loading things on it and move them to a small vacant house on his father's place; in about three weeks would move back to his father's home and never mention about having moved away; on one occasion he went to the cow lot, caught the cow, put a bridle and saddle on her, and declared he was going to town, 'just as unconcerned as if he was riding a horse;' was 'always hunting and uneasy about something;' would pick up waste paper, count things, flies, for instance, and on one occasion got a comb and brush hanging on the wall, placed same under a box, and asked the witness to sit and watch them because they were valuable and he didn't want any one to get them. At times, Mrs. Branham said, appellee would declare he was 'going to clean up things,' and would 'take the poker or anything and wave it around over the house;' would get his gun and shoot up through the ceiling of the house, and on one occasion shot at his father and at witness' foot; had the shooting 'spells about every two months. While witness and appellee were temporarily at Fort Worth, appellee, without her knowledge, took their son, then about four years old, to a railway depot and left him asleep behind a barrel, where she afterwards found him; and on another occasion, without telling her he meant to do so, took the boy away from their home and kept him all night. The witness said she never knew appellee to do a day's work, but also testified that he worked for about six weeks at a nursery, where he, was paid $3 a day. However, she said the work he did there was gathering beans and other vegetables, which he was supposed to sort out, but which he mixed together and she had to separate same. Mrs. Branham testified further that appellee on one occasion whipped their son with a rope, and had slapped her jaws 'and such as that.' Appellee was finally taken into custody by their neighbors, the witness said, and was confined in jail until he was sent to said colony at Abilene. In jail he refused to eat until he accumulated a great quantity of food, and then would 'eat like a hog.' He paid no attention to witness nor their son when they visited him in the jail, and in 1907 when she and their son were with him about

an hour. On the facts stated by her and knowledge she acquired while she lived with appellee, Mrs. Branham was of the opinion, she testified, that he was of unsound mind when he executed the deed to his mother, C. V. Jackson, February 8, 1912, and was not then 'mentally capable (quoting) to know and understand and appreciate his property rights.' Six or seven other persons who knew appellee before he was sent to Abilene, in 1906, testified to conduct of his similar to that detailed by Mrs. Branham, and said they, too, were of the opinion appellee on said February 8, 1912, was not mentally capable of transacting business of any kind; and this opinion was concurred in by three or four physicians who testified in reply to hypothetical questions propounded to them. Some of the witnesses who testified as experts had never seen appellee, and none of the witnesses (except Dr. T. B. Bass) who testified as to his mental condition ever saw him after he was sent to Abilene in 1906, except for a few days in the fall of 1911, when he visited his home in Delta County. Dr. T. B. Bass, above referred to, was the superintendent of the State Epileptic Colony at Abilene and had known and treated appellee from the time he became an inmate of the colony to the time of the trial. Dr. Bass testified by deposition. He said appellee's mental condition on February 8, 1912, the day he executed the deed to his mother, C. V. Jackson, was good. In reply to cross-interrogatories propounded to him by appellee, Dr. Bass testified as follows:

" 'I saw or examined J. C. Jackson about twice a day while he was in the Colony from April, 1906, to February, 1909, and from 1909 to 1912 not so often, sometimes every day and sometimes not so often. From 1906 to February 8, 1912, J. C. Jackson would sometimes have several fits a day, sometimes he would go several weeks or longer without having an epileptic fit. Sometimes he had hard convulsions and would go to sleep. Sometimes in dazed condition a short time after; sometimes he would be a maniac for several days. His mind is bad now. Usually, however, he is rational and will answer questions intelligently and remembers things very well. His mind is not as good now as it was sometimes in 1906. His physical condition is fair at this time. His physical condition is sometimes better, sometimes worse. J. C. Jackson escaped from the Colony about five or six times from 1906 to February 8, 1912. I don't think J. C. Jackson escaped from the Colony in the year of 1911. It is a fact that during the period from 1906 to February 8, 1912, that J. C. Jackson was brought back to the Colony by sheriffs and other peace officers. Yes, in probably 1909 or 1910 J. C. Jackson was brought back to the Colony by a guard, that he undertook to escape from said officers, and that it became necessary, or they did, shoot at or near him before getting him under control. J. C. Jackson discussed this business transaction with me of executing said deed of conveyance to 43 acres of land. My recollection is that he did go to town to sign the deed. He was permitted to go to town, to execute this deed. I remember that some one came to the Colony to get him to sign the deed, and he talked to me about his condition and capability of signing a deed. He has frequently written letters since he has been at the Colony, and has picked cotton for money and has spent it as he saw fit. There were frequent times all along from 1906 to February 8, 1912, when J. C. Jackson was incapable a good portion of the time of transacting important business matters and understanding the nature and consequences of his act. It is not a fact that the said J. C. Jackson has been mentally incapable of executing a deed of conveyance to land and understanding its nature, effects, and consequences practically all of the time since 1912. Epilepsy has its individuality. Many very smart people have epilepsy. Some have it for years without any deterioration of mind. Some lose consciousness for a few minutes and mind is all right soon after. Some are mentally disturbed for quite a while before and after having a fit. Some minds clear up after having a fit. Some have frequent spells of mania. Most cases who have frequent seizures tend to dementia. The disease of epilepsy is frequently accompanied by mental derangement. Sometimes persons suffering from epilepsy and frequent epileptic fits over a long period of years become incapable mentally of transacting important business and understanding its nature and consequences. I think epileptics are more likely to become insane than any other class of people.' "

In addition to the testimony above set forth, we will set out a brief portion of the expert testimony offered by plaintiff in error. Dr. T. M. Darwin testified:

"The clinical types of epilepsy are petit and grand-mal, the two major types. There's the petit mal, or little mal, is a mild form, may be talking to him and he will stop a very few seconds and then pick up the conversation and go on where they left off and go on; we might have a little twitching, and different types like that, and then the major or grand-mal is convulsion and loss of consciousness, possible chewing of the teeth, tongue, etc. Grand-mal form is not considered curable. It is progressive. As these seizures come along they get closer together and harder and finally if they are not under the influence of drugs and kept that way, they finally go on and get what we call status epilepticus, constant epilepsy. When they reach that stage, I would not think that they were capable of knowing and appreciating their property rights. The technical term is epilepticus status. When a person with epilepsy reaches the stage or status of the disease they are under constant strain of expectancy and apprehension there is something going to happen, one is that somebody is after him, and another is that he is wandering and knows nothing of it, then possibly have a few lucid intervals then he is off again and remembers nothing of it, and that gradually leads until some take the homicidal mania and others will sleep, etc., different types. I would say that a man who had reached such a stage in epilepsy that he was taken to an epileptic colony and escapes after five or six years confinement, and comes back to his home and doesn't recognize those with whom he was closely associated before, with a wild stare in his eyes, was in the status stage. Basing my answer on the hypothetical question, assuming that a man did all these outrageous things, I would say he was a man of unsound mind. I don't think he would be capable

of knowing, understanding and appreciating his property rights."

Dr. E. B. Wheat, witness for defendants in error, testified:

"In the grand mal form of epilepsy the brain and nervous system are more seriously involved than in the petit-mal; the symptoms more exaggerated. When the disease has developed to the grand-mal stage, it is considered almost incurable. * * * The longer the disease lasts the more the brain and mind becomes impaired and deteriorates."

Dr. D. O. Lowry, witness for defendants in error, testified:

"They don't often get well of the grand-mal form. The petit form often develops into the grand-mal form. When they get the grand-mal, it is considered incurable by my profession, generally. The grand-mal form of epilepsy works directly upon the brain. The entire nervous system is more or less involved. The longer one has that form of epilepsy the more impaired the mind becomes, that is the general tendency. It is reasonable because it is a constant attack upon the seat of the nervous system * * * I would think a person who begins having epileptic spells at 16 years of age and continues to have them until he is about 40 years old when he is committed to the epileptic institution at Abilene, staying in there for five or six years, gets out and comes back to the community where he lived before he went to that institution, does not recognize his closest friends and members of his family, stops in one house, sits down to breakfast, begins to pile all the things on the table up to his plate and eats very rapidly while the members of the household are sitting down there, finally he breaks down and begins to cry and remarks 'I ought not to have done that, I am sorry I did that,' crying all the while, then he pushes the things away back to the parts of the table where they belong, in a few seconds he gathers them up again and does the same thing, then looks out of the door and keeps saying 'they are coming after me' and continues that conduct two or three days, I would say he was mentally unsound."

Dr. T. R. Moorehead, witness for plaintiff in error, testified:

"I know J. C. Jackson, have known him for 33 years. I was with him in school and my association with him would be like any other neighborhood boy's would be for 12 years. His family was neighbor to my family and after I began the practice of medicine, I practiced some in his family. I consider that I am intimately acquainted with J. C. Jackson. I have treated J. C. Jackson for injuries received when he fell off a load of hay and also for epilepsy grand-mal. The last time I saw him was in the year of 1911. His mental and physical condition when I last saw him was very poor. He did not recognize me when I spoke to him and when told who I was it did not concern him in the least. Yes, during a part of the time I knew him he was suffering from a disease during the last five years that I knew him he was suffering from grand-mal epilepsy. He was subject to epileptic fits. He had grand-mal epilepsy for about 5 years. There are two forms

of epilepsy—grand-mal and petit-mal. In the grand-mal epilepsy you have general convulsions and become completely unconscious, and in the petit-mal, you have partial convulsions and you are conscious or partially unconscious. In grand-mal epilepsy the mind becomes weakened and eventually the person afflicted becomes unsound in mind. In the petit-mal epilepsy a person might go through life and his mind might not be affected to an extent that it would disable him from attending to the normal affairs that would demand his attention. The grand-mal form of epilepsy affects the mind by eventually bringing on insanity. * * * I would consider J. C. Jackson of unsound mind at the time I saw him in the year of 1911. He failed to recognize me and when told who I was he still did not show interest in me, and he would answer my questions I asked him in an absent manner or else would not answer it at all, and this was a very different attitude than that which he would show when I knew him in former years. I would consider him a person of unsound mind. He was not capable mentally of transacting business. He would be a person of unsound mind. No, he did not have necessary mental capacity to transact the ordinary business affairs of life, including a conveyance of his real estate, and understand the nature and effect and consequences of his action."

After a careful consideration of the evidence presented by this record, we are unable to agree with the conclusion of the Court of Civil Appeals that there was no evidence of probative force that Jackson was mentally incompetent at the very time he executed the deed.

■ In considering whether there was evidence tending to establish Jackson's incompetency on February 8, 1912, only evidence favorable to such issue must be considered, as the finding of the jury necessarily implies that evidence favorable to plaintiffs in error was believed and accepted by the jury. Stewart v. Miller (Tex. Civ. App.) 271 S. W. 311; Eastham v. Hunter, 98 Tex. 560, 86 S. W. 323; Harpold v. Moss, 101 Tex. 540, 109 S. W. 928.

■ The evidence of the witnesses showing Jackson's mental condition before and after the execution of the deed was only admissible on the theory that it might properly be considered by the jury as a circumstance tending to show his mental condition at the very time the deed was executed. Upon no other theory was the same admissible, as his mental condition before and after the execution of the deed was not an issue in the case.

It is well settled that it is permissible to receive evidence as to the condition of a person's mind both before and for a reasonable period after as tending to show his mental condition at the time in question. Stewart v. Miller (Tex. Civ. App.) 271 S. W. 311; Farmers' State Bank of Quanah v. Farmer (Tex. Civ. App.) 157 S. W. 283; 18 C. J. p. 218, § 131; 14 R. C. L. § 71, and authorities there cited.

We think the correct rule on this subject

was announced by the Court of Civil Appeals which decided this case in the case of Caddell v. Caddell, 62 Tex. Civ. App. 461, 131 S. W. 432. In discussing a similar question the court said:

"It is true that, if the portion of the Notary's evidence objected to be stricken out, there remains no direct testimony that on the very day of the execution of the deed deceased was insane. But the Court was authorized to consider the proof of the mental and physical condition of the grantor both before and after the execution of the deed, as we must assume he did, in determining the condition of the mind of the grantor at the time of the execution of the deed. And this proof is sufficient to support the finding of general imbecility and mental incapacity continuing all during the period before the execution of the deed and until the grantor's death afterwards."

■ The only testimony outside of expert witnesses showing Jackson's mental condition on the very day of the execution of the deed was that given by Dr. Bass by deposition. In this deposition he stated:

"In my opinion the said Jackson was mentally competent to execute the deed and understand the nature and effect of the transaction at the time of the execution of the deed."

This testimony was admitted over the objection of plaintiff in error. In our opinion, this was not legal testimony, as the witness' answer was an expression of an opinion on the very question to be determined by the jury. Stewart v. Miller (Tex. Civ. App.) 271 S. W. 311; Brown v. Mitchell, 88 Tex. 350, 31 S. W. 621, 36 L. R. A. 64; Williams v. Livingston, 52 Tex. Civ. App. 275, 113 S. W. 786; Baker v. McDonald (Tex. Civ. App.) 159 S. W. 450; H. & T. C. Ry. Co. v. Roberts, 101 Tex. 418, 108 S. W. 808; T. & N. O. Ry. Co. v. Peveto (Tex. Civ. App.) 224 S. W. 553. Eliminating, as we must, this testimony, it is shown by the remainder of Dr. Bass' testimony that a considerable portion of the time from 1906 to the date of the execution of the deed, the plaintiff's mental condition was bad, and that it was also bad at the time of the trial.

Several of the expert witnesses gave it as their opinion, in answer to hypothetical questions based upon the evidence adduced, that Jackson was mentally unsound and incapable of appreciating and knowing his property rights at the very time the deed was executed. In view of the progressive nature of the disease with which plaintiff in error was afflicted, and its tendency to weaken and ultimately destroy the mind as it progressed, we think the testimony of these experts was of such probative force as would justify a finding of the jury in accordance with such opinions. This is especially true in view of the evidence given by other witnesses which tended to show that as the disease progressed, Jackson's mental condition did in fact grow worse. It appears that

when he escaped from the asylum in the fall of 1911, a few weeks before the deed was executed, he was in much worse mental condition than when he was first incarcerated in the asylum in 1906. At that time he failed to recognize a number of lifelong friends and acquaintances, did many peculiar and unusual things, his unsound mental condition being so apparent as to specially attract the attention of a number of friends and neighbors. Several of these testified from their observations of him at that time that they did not believe he then possessed sufficient mental capacity to understand and appreciate the nature of his property rights. In fact, on this visit he became violent to such an extent it was necessary to confine him in jail until he could be removed to the asylum.

Even though the record was silent as to Jackson's mental condition, so far as the personal observation of any witness was concerned, on the very date the deed was executed, the evidence as to his condition only a short time prior thereto and at the time of the trial was amply sufficient to justify the deduction made therefrom by the jury in its findings on this issue.

■ The Court of Civil Appeals seems to have concluded that as there was testimony showing Jackson had lucid intervals, no presumption of the continuance of the unsound condition of his mind shown shortly prior to the execution of the deed would be indulged. We do not agree with the proposition that the question is one of presumption as to Jackson's mental condition at the time the deed was executed, but rather is one involving the right of the jury to draw the conclusion that Jackson's mind was unsound at the very time the deed was executed from the facts showing his mental condition before and after such time, and the probable effect on his mind of the incurable disease from which he was suffering.

Unquestionably, if Jackson had made the deed in the fall of 1911 when he escaped from the asylum, the testimony would clearly have been sufficient to sustain a finding of mental incapacity to execute it. As the medical testimony offered showed the tendency of the particular form of malady with which he was afflicted was to grow worse, and that it was of such a nature as was reasonably calculated to ultimately undermine and completely destroy his mentality, we think a jury had the right to determine from such evidence that his mental condition was worse in February, 1912, than in the fall of 1911, and this regardless of the fact that no witness observed his condition at the time the deed was executed.

Since we have reached the conclusion that the Court of Civil Appeals was not justified in reversing this cause for the reason assigned, other assignments urged by de-

fendants in error are entitled to be considered. Holland v. Nimitz, 111 Tex. 419, 232 S. W. 298, 239 S. W. 185. We have carefully examined the other assignments urged and do not find that such error is presented thereby as would justify the judgment of reversal rendered by the Court of Civil Appeals.

██ If the holding of the Court of Civil Appeals is merely that the evidence was insufficient to sustain the finding as to Jackson's mental condition at the time the deed was executed, such finding is binding on this court, and we would be compelled to affirm the judgment of the Court of Civil Appeals, notwithstanding our disagreement with it on this question. We do not, however, so regard such finding. It is distinctly held that there is no "evidence" of probative force tending to show that he was mentally incapable of binding himself by contract at the very time he executed the deed." This is not a finding of fact as to insufficient evidence, but rather an erroneous conclusion of law to the effect that the jury was not authorized to find that Jackson was mentally unsound at the time he executed the deed from evidence which showed mental unsoundness before and after that time.

Accordingly, we recommend that the judgment of the Court of Civil Appeals be reversed, and the judgment of the trial court affirmed.

CURETON, C. J. Judgment of the Court of Civil Appeals reversed, and judgment of the district court affirmed.