ADAMSON v. BURGLE et al.

In re BATES' ESTATE.

No. 11474.

Court of Civil Appeals of Texas.
San Antonio.

Feb. 21, 1945.

Rehearing Denied March 21, 1945.

T. B. Blanchard and M. C. Chiles, both of Houston, and Walter Groce, of San Antonio, for appellant.

Boyle, Wheeler & Gresham, of San Antonio, for appellees.

NORVELL, Justice.

This is a will contest. Probate of a purported holographic will and codicil of Mrs. Nellie Burgle Bates, deceased, was refused by the county and district courts. The case is here on appeal from the district court judgment based upon jury findings that the testatrix lacked testamentary capacity and was subjected to undue influence. L. A. Adamson, the proponent, is the appellant. James A. Burgle and others, heirs at law of Nellie Burgle Bates, are appellees.

Appellant by his points contends that the case must be reversed for the reasons that, (a) there is no evidence, or insufficient evidence, to support the jury's findings, (b) appellees' attorneys made improper arguments to the jury, and (c) the trial court erred in admitting certain opinion evidence of medical experts.

In considering an attack made upon the sufficiency of the evidence to support the jury's finding, the rule is that this court must view the evidence in the light most favorable to the prevailing party below. We think that appellant's contentions involving the sufficiency of the evidence and arguments of counsel may be considered together, as both contentions involve a review of the evidence in some detail. A statement of the evidence is also pertinent as a background in considering appellant's further contention that the trial court erred in ruling upon the admissibility of opinion testimony.

The following statement of the evidence is for the most part taken from the testimony of appellees' witnesses. Some undisputed facts are stated and where necessary

to a proper understanding of the points involved, we also give the substance of testimony given by appellant's witnesses.

The will and codicil offered for probate bear the dates of August 10th and August 21st of the year 1930. The testatrix died on October 23, 1942, at the age of 67. She had been adjudged a person of unsound mind on January 7, 1931, and committed to the San Antonio State Hospital for the Insane, at which place she died. The testatrix had no close relatives living after the death of her mother in April, 1930.

The will directed that certain arrangements be made with reference to the funeral of testatrix; that her just debts be paid; and then provided: "In appreciation of what he did to relieve my Mother of business worry in the management of our estate and make her happy, it is my will and desire that what property I die possessed of shall pass in fee simple to L. A. Adamson of Houston, Texas, and I hereby constitute and appoint him executor and direct that no bond or other security be required of him as executor."

The codicil provided for the payment of $5,000 to "my half cousin who was Maggie Pepin before marriage"; $1,000 to "my dear half cousin Emma Adele Pepin," and $1,000 to "my faithful friend Mrs. J. W. Roche."

The appellant, Adamson, is a practicing lawyer of Houston, Texas. He was sixty-three years of age at the time of the district court trial, and had rendered services as a legal adviser for the testatrix as well as for her father and mother prior to their respective deaths.

Adamson had known Andrew H. Burgle, the father of testatrix, and represented him as a lawyer in various business transactions. Mr. Burgle died in 1914 or 1915, and thereafter Adamson continued to represent his widow, Emma H. Burgle, and attend to her business affairs. Mrs. Burgle and her daughter Nellie Burgle Bates moved from Houston to San Antonio, Texas, in 1924. They purchased property in San Antonio and Adamson handled the details of the transaction. Mrs. Emma Burgle died on April 25, 1930. Her will designated Mrs. Bates as sole beneficiary. Mr. Adamson had prepared the will and acted as Mrs. Bates' attorney in probating the same in Harris County, Texas.

About the middle of August, 1930, Dr. Merton Minter, a practicing physician, was called to treat Mrs. Bates for "a rather vague gastro-intestinal complaint." According to Dr. Minter, no detailed examination was made upon his first professional visit to the home of Mrs. Bates. He made several further calls, however, and the latter part of August Mrs. Bates told him that after dark she had gone to a church to pray, attired in a night gown, and had remained in the church all night. When daylight came she was afraid to go home and hid in the church until she became hungry and then went to a neighbor's house to get something to eat. About this time (the latter part of August, 1930) Dr. Minter reached the definite conclusion that Mrs. Bates was insane and sent her to the Medical and Surgical Hospital in San Antonio. In September of 1930, Dr. Minter notified Mr. Adamson of Mrs. Bates' condition, and shortly thereafter Mrs. Bates was transferred to the Florence McDermott rest home in San Antonio.

Mrs. Bates remained in the McDermott home from some time in September, 1930, until January of 1943, when, as above pointed out, she was adjudged insane and committed to the State Hospital. Adamson paid $1,290.88 to Mrs. McDermott for Mrs. Bates' care during this period of time, out of funds belonging to Mrs. Bates.

On or about September 19, 1930, Mrs. Bates signed a promissory note for $5,000 payable to the order of the Houston Land and Trust Company, which was secured by an assignment of certain promissory notes owned by her. Mr. Adamson handled this transaction and out of the proceeds of said note he retained the sum of $2,500. According to his testimony, he had performed legal services for Mr. Andrew Burgle, Mrs. Emma Burgle and Mrs. Bates of a reasonable value of $5,000, for which he had not been paid.

The witness Mrs. Emma Adele Pepin Swim testified that she saw Mrs. Bates at the McDermott home, and that upon one occasion "she (Mrs. Bates) had her false teeth out, she had her hair done up in a little knot on top of her head and it was stringing down, and she had on a torn night gown, * * * she was very unhappy appearing and she was raving. * * * (Mrs. Bates was in) a little hip room, under the roof, a porch like, and there wasn't anything in there scarcely, I didn't notice anything more than a bed, * * * and she was tied to that bed, and Mrs. McDermott came up and she said it looks bad to

have her tied, but she says, 'That doesn't hurt her, we use the silk stocking method * * * and it never leaves any abrasions on the skin.' * * * (Mrs. Bates) says I am tied again, I am tied again."

Dr. T. N. Goodson, the Bexar County Health Officer, and the witness Mrs. Alverda Butler also testified that they had seen Mrs. Bates tied to the bed while at the McDermott home. Mrs. Butler further testified that she and her grandmother lived in Mrs. Bates' house while the latter was at the McDermott place; that Mr. Adamson came to San Antonio frequently and spent a great deal of his time at the Florence McDermott home.

Dr. W. J. Johnson, an expert upon nervous and mental diseases, testified that he was the superintendent of the San Antonio State Hospital for the Insane from the time Mrs. Bates was committed to that institution, in 1931, until the year 1941, and had seen her at least once every two weeks for a period of ten years. Dr Johnson's description of Mrs. Bates' condition when he saw her shortly after her commitment is as follows: "She was very much depressed. It was with difficulty that you could get her to even answer questions. She was withdrawn from reality, sad, crying, wanted to keep her face covered up, and usually wanted to sit with her head bowed over her lap, and was moaning most of the time."

Dr. Johnson stated that Mrs. Bates was "perfectly harmless," and it wasn't necessary to tie her down.

As to the particular type of insanity with which Mrs. Bates was affected, Dr. Johnson testified:

"It was rather hard to tell the particular type, because she had the clinical manifestations or symptoms of both manic depressive insanity and catatonic type of dementia praecox. At that age it may have been either one. I am inclined personally to believe that it was a dementia praecox, catatonic type, because of her record, and because of the onset of the disease. Then she had the voices, she would hear voices, and she would see visions, that were delusions, and that occurs more frequently with the dementia praecox. * * *

"Catatonic is one of the forms of dementia praecox in which the patient is stationary. You can sit them down and they will stay there all day, or if you will hold the hand out and leave it, they will hold it there for a long time. They are in a trance and more stuporous, so to speak, and more fixed in their movements, or lack of movements rather. * * *

"Dementia praecox is a diseased condition of the mind that usually begins in earlier life. However, you may not have a break until late. That is simply a deterioration or a weakening of the mind, the higher processes of memory, judgment, reasoning deteriorate, and gradually weakening all the time."

Dr. Johnson further testified that although an accurate estimate of the time Mrs. Bates had been mentally ill prior to the first time he saw her, in January, 1931, it was his opinion, based upon his diagnosis of her condition and his observation of her, that "she must have been sick some minimum of two years (prior to January, 1931), perhaps four, more likely three or four, because she couldn't have gotten into the state of dementia that she was in a short time."

Dr. Johnson also testified that in his opinion Mrs. Bates was insane on August 10, 1930; that on said date she was unable to understand any business transaction she may have had, and was unable to estimate the type, character or amount of her estate and those who would naturally be entitled to her bounty. He further testified that in his opinion Mrs. Bates, on August 10, 1930, was mentally unable to write the disputed will, of her own volition.

However, Dr. Johnson did testify that it would be possible for a person suffering from the type of insanity which afflicted Mrs. Bates to write an instrument similar to the will here involved, by constant urging and dictation; "if you can keep after them you can get them to write, but you couldn't leave a copy with her and tell her to copy it, because she wouldn't do it. * * *

"Those patients of that type, if you tell them to do more than one thing at a time, they can't, because they cannot think of anything except just the first thing, if you tell them to do a thing and they start doing it, they will stop, you must keep repeating and urging your suggestion to them, because they will not keep on, they do not remember and they can't carry on for any length of time, they will quit. So that type of patient, you must tell them to write and write again, write this, now write this, write that, it is a continual suggestion to them what to do."

Dr. Johnson also stated that in his opinion Mrs. Bates could not have written the codicil here involved except by "continued suggestions."

Appellant introduced in evidence certain letters in the handwriting of Mrs. Bates, together with the envelopes in which they had been received through the mails. The dates of the postmarks upon the letter covers extend from March 29, 1930, to August 13, 1930. Dr. J. A. McIntosh, an expert in mental diseases, testified that from an examination of the contents and handwriting of these letters, he detected no evidences of insanity. Dr. McIntosh gave similar testimony with reference to the will and codicil involved, after examining photostatic copies thereof.

The letter postmarked August, 1930, was written in pencil and addressed to Mr. L. A. Adamson. It is as follows:

"Wednesday

"Dear Mr. A,

"Thank you for the letter, but I know you can't write every day & I don't expect it. I am trying to get better, but the weather is so hot and I am weak as can be.

"Tell Mrs. Roche I have not written to her because I have been sick but will try and write soon.

"I have friends and acquaintances here Mr. A—but mother never allowed me to tell business affairs to any one & that is why I said I had only you to advise me, & I have never had any real business to attend to before & will you have patience with me and help me not to worry.

"Nellie

"Pray every day for me Mr. A."

Mr. Adamson testified that he received both the will and codicil here involved through the United States mail. The containing envelopes were not, however, introduced in evidence. Mrs. Bates, according to Adamson, had a copy of her mother's will in her possession. The will written by Mrs. Bates was very similar in wording to that prepared for her mother by Adamson.

The argument of appellees' attorneys complained of were as follows:

"But, gentlemen of the jury, you may conclude that Adamson, when he had her in that home that he insistently and patiently told her, 'Write this. Write this,' and that she wrote it. Do you recall, gentlemen of the jury, when Mrs. Swim went there one time and she said this poor woman was raving and I asked her, 'How was she rav-

ing?' And she said, 'Oh, they have tied me again. They have tied me again. They have tied me again.' Do you suppose that it was possible for L. A. Adamson to go there, insist on her copying this will and say, 'I will untie you if you will copy this will.' And when she got tired and hesitated, do you suppose it was possible for him to say, 'Well, now, keep on copying that because if you don't, if you stop and don't keep on copying as I say, I will tie you up again.' That was the thing that she dreaded, that was the thing that Mrs. Swim said she was raving about,— 'They have tied me again. They have tied me again.' * * *

"Gentlemen of the jury, I want to show you a little circumstance,—and in these cases when there has been great imposition by the man that has a poor, unfortunate woman completely under his control and conceals her from disinterested people who could be witnesses against him, as the law gives you the right to do and it is your duty to do, you have to reach many conclusions on circumstantial evidence. The law prohibits this man from testifying as to transactions that he has had with the deceased. This is a protection to us. But it also may be a protection to him. He knew the law. He kept her concealed from disinterested witnesses. * * *

"And he (meaning L. A. Adamson) betrayed her to the extent that after Dr. Minter had told him that she was definitely insane he had her sign her name to a $5,000 note and put up her $16,000 vendor's lien note, and he took the money for himself, and appropriated out of that money the sum of $2,500 from these people that he thought so much of that he would never charge them a fee. No, he never charged them a fee until this poor woman was definitely insane, and then he grabs for his own purpose $2,500. And this confederate, Mrs. Florence McDermott, he pays her on the basis of $80 or $90 a week to keep her down in that bare room, that little room under the roof, tied to a bed, tied hand and foot. That is the one she appeals to, and in the postscript she says to him, "Pray for me every day, Mr. A.' * * *

"Could there be any stronger evidence of undue influence? That letter they introduced themselves shows that she was depending upon him in her insane condition, in her worried condition, in her grief stricken condition, because her father had

394

told her to take his advice and his advice alone. She was depending upon him, and him alone. And he dictates this will to her, leaving everything to himself. But gentlemen, the Bible says that 'the wicked flee when no man pursueth.' And ten days later he even in his depravity realized that 'I have gone too far, I cannot afford to grab this whole estate.' I say the wicked fleeth when no man pursueth. There were two relatives down here, Mrs. Swim and Mrs. Oliver. He was sore at Mrs. Swim because she had sought to protect Nellie Burgle Bates. Mrs. Oliver had never seen Mrs. Bates but one time. Adamson did not even know their names, he could not even remember their names. He puts them in the will by their maiden names, Maggie Pepin and Adele Pepin,— but he tries to placate the two relatives that are down here, one of whom had been giving him a lot of trouble, and the other could give him trouble. And he goes to that poor unfortunate woman and he dictates again insistently. And I wonder if he told her, 'If you don't write what I say I am going to tie you up.' He dictates that codicil, in which he leaves $5,000.00 to the cousin she had only seen once and only $1,000.00 to the cousin that had sought to take care of her. And he leaves another $1,000.00 to the woman who had been living in her home, hoping to placate her in the event we might call on some neighbors, he gives her $1,000.00 too. * * *

"It is unquestionably true that a person can have a mind involuntarily, or whatever kind of insanity you might want to call it, and that for a few moments they could think clearly, and especially if you keep on arguing with them and telling them, 'You write this and you write that.' * * *

"Now, let's get down to the other matter. The mother's will was probated in July. There wasn't much time. Nellie Bates ran off on the 29th, and he soon realized that as far as a will from Nellie Burgle Bates was concerned, with these witnesses and executed in the proper manner, was almost an impossibility, that he could not find any two men that would swear that she had testamentary capacity. And so he took her out to the McDermott home where she was absolutely under his control. And what could he have done there? * * *

"As far as the will is concerned, I wanted to call your attention to this from those letters and otherwise. Do you think Nellie Burgle Bates could have written a will with all that legal phraseology, and which provides that the executor takes it over himself and does not have to make any accounting of any kind except for an inventory and appraisement? Independent executor. * * * Anyhow, here was this estate. She was no longer in condition to execute a will properly, as required by law. Then she was taken out there to that home where he was present frequently and had all the opportunity in the world to talk to that poor woman and have her at his suggestion write this will. * * *

"I say to you gentlemen that Nellie Bates never formulated or drafted this will. I will say, too, that Nellie Burgle Bates never knew that her handwriting would have been sufficient, if it was wholly in her handwriting, without witnesses, if she had had mental capacity. That will was written by a lawyer. There is no question about that. He did not have to put August 10th, he did not have to put August 21st in there. When he was writing them out all he had to do was date it August 10th and date the codicil August 21st, and then when he presented them why that was all there was to it. He probably didn't know anyone might question the dates. But, gentlemen, I do question the dates."

We conclude that the evidence supports the findings of the jury. We are here considering a will and codicil wholly in the handwriting of the testatrix. There were no witnesses to the execution of these instruments. No eyewitness testified as to the mental condition of the testatrix at the very time of the execution of the will. In this, the case here is distinguishable upon the facts from the situation usually presented in cases involving contentions of lack of testamentary capacity and undue influence. Further, if credence be given to Dr. Johnson's opinions, the will and codicil could not have been written by the testatrix of her own volition, but could have been written by Mrs. Bates only in the event that repeated and continued promptings and suggestions were made to her by some other person. This is not a case (viewed in the light of appellees' testimony) wherein a person was mentally capable of making a will and it is contended that some person by undue influence caused his will to be substituted for that of the one purporting to make the will, but is one in which a written instrument pur-

porting to be a will could not be produced except by the exercise of undue influence.

■ Appellant's primary contention with reference to the arguments of appellees' counsel is that the various inferences stated in the course of said arguments are inflammatory in nature and have no support in the evidence. We have held that the evidence supports the jury's findings which embrace appellees' theory of the case. It therefore follows that counsel was entitled to argue this theory to the jury. So long as counsel adheres to the facts and issues presented by the evidence, they "are permitted to show the environments of the case; they may comment upon the bias or interests of the parties and witnesses, and may discuss the reasonableness or unreasonableness of the evidence and its probative effect or lack of probative effect." Ramirez v. Acker, 134 Tex. 647, 649, 138 S.W.2d 1054, 1055.

It is true, as suggested in appellant's brief, that no witness testified directly that Adamson dictated either the will or the codicil, or that he told Mrs. Bates that he would tie her up unless she followed his dictation. Conclusions as to the truth of these charges, if established at all, must be inferred from other facts or circumstances in the case. However, if the premise that Mrs. Bates could not have written the will of her own volition be accepted, then motive and opportunity become powerful and compelling factors in explaining the production of the will and codicil which appellant seeks to probate.

■ Practically all of appellees' argument is directed to these factors of motive and opportunity premised upon testimony in the record which tended to show that Mrs. Bates' mental condition was such that she could not knowingly and willingly have prepared the written instruments which are the subject of dispute in the lawsuit. It is true that there is evidence in the record which contradicts the evidence adduced by appellees. This evidence, if believed and given credence by the triers of fact, would make untenable the conclusions or inferences suggested by appellees' counsel. This does not render the argument objectionable. A similar situation is presented in every case involving a conflict of evidence.

■ No objection was made by appellant to the argument in the court below. The contention urged here is that said argument was so prejudicial and inflammatory that an instruction of the court would not cure the error. If that particular part of the argument wherein counsel charged that appellant had kept Mrs. Bates from disinterested witnesses and that the law give the jurymen the right, and made it their duty, to reach many conclusions on circumstantial evidence, be considered improper, all prejudice resulting therefrom could have been removed by the court with an admonition that the jury was to be governed in matters of law by the charge of the court and not by statements of counsel. Ramirez v. Acker, 134 Tex. 647, 651, 138 S.W.2d 1054, 1056.

■ In their argument counsel also made reference to Adamson's being prohibited by law from testifying as to transactions with the deceased. Article 3716, Vernon's Ann.Civ.Stats. This statement was not accompanied by a direct or inferential suggestion to the jury to consider matters which might have been developed in evidence except for the statutory rule. This case therefore differs from Johnson v. Durst, Tex.Civ.App., 115 S.W.2d 1000, and similar cases which hold that the prejudicial effect of an argument which directly or impliedly invites the speculation of the jury upon matters not properly in evidence because of the statute can not be removed by an instruction of the trial court. Here the point of the argument was that Mrs. Bates while at the McDermott home was under the control of Adamson, and had not been seen by witnesses who could describe her then condition. From the standpoint of appellees' evidence this was a legitimate circumstance for the jury's consideration. Any improper statements as to the law of the case could have been rendered harmless by an instruction of the trial court. Appellant by failing to object has waived the right to assert error. Ramirez v. Acker, supra.

The contentions that the case must be reversed because of arguments of counsel are overruled.

■ Appellant presents five points in connection with his argument that the trial court erred in admitting certain expert opinion testimony. One of these points relates to the testimony of Dr. T. N. Goodson, the Bexar County Health Officer. The particular objection made to a question propounded to Dr. Goodson was that it was leading and suggestive. In our opin-

ion the question was not subject to the objection urged, and consequently no reversible error is disclosed by the trial court's ruling.

The remaining four points have reference to Dr. Johnson's testimony which must be examined in some detail, as the evidence goes to the foundation of appellees' theory of the case.

In connection with the submission of the issue involving testamentary capacity, the trial court instructed the jury that "testamentary capacity to execute a valid will means that the testator must have been capable of understanding the nature of the business she was engaged in, the nature and extent of her property, the persons to whom she meant to devise and bequeath it, the persons dependent upon her bounty, and the mode of distribution among them; that she must have had memory sufficient to collect in her mind the elements of the business to be transacted, and to hold them long enough to perceive at least their obvious relations to each other, and be able to form a reasonable judgment as to them."

The following questions were propounded to Dr. Johnson and the following answers given over appellant's objections that the question "involves a mixed question of law and fact, invades the province of the jury and of the court, and is irrelevant and immaterial," viz:

"Q. I will ask you whether or not, based upon these matters that you have related, whether on the tenth of August, 1930, she (Mrs. Bates) would have been able to know anything intelligently about any business transactions that she might have had? A. She would not have been able to.

"Q. Would she have been able at that time to make an estimate of the type and character and the amount of her estate and those who would naturally be entitled to her bounty? A. She would not have been able to.

"Q. Now, Doctor, I will read this first one. (Counsel then read the will.) Now, Doctor, based upon your observations that we have gone over several times and your knowledge of the type of insanity with which Mrs. Bates was afflicted, I will ask you if it would have been physically possible for her, on the tenth day of August, 1930, to have written this document of her own volition? A. Physically, I wouldn't know what her condition was, except as

she expresses it in there in the will, that she was emaciated. Mentally, she couldn't have done that.

"Q. Just state again, please, if there had been left a copy of this instrument and she had been instructed to copy it and then she had been left alone, just what would have happened? A. She wouldn't have copied it without continual repeated suggestions."

Appellant states in his brief that the judgment must be reversed because "the questions propounded to the witness required him to pass upon and determine for the jury the very questions that the jury itself was called upon in the court's charge to determine."

In determining the question presented, it is necessary to revert to certain fundamental rules applicable to opinion evidence. The general rule is one of exclusion—"the testimony of a witness must be limited to the facts of which he has personal knowledge, and that he must not give his individual opinion or conclusion thereon." 19 Tex.Jur. 13. The receiving of opinions of either experts or nonexperts comes under an exception to the general rule. Dean Wigmore in his authoritative work on Evidence, in discussing the theory of the exception, after a review of its history and development, says: "The sum of the history is, then, that the original and orthodox objection to 'mere opinion' was that it was the guess of a person who had no personal knowledge, and the 'mere opinion' of an expert was admitted as a necessary exception; that the later and changed theory is that wherever inferences and conclusions can be drawn by the jury as well as by the witness, the witness is superfluous; and that thus an expert's opinion is received because and whenever his skill is greater than the jury's, while a lay opinion is received because and whenever his facts cannot be so told as to make the jury as able as he to draw the inference." VII Wigmore on Evidence, 3rd Ed. 10, § 1917.

A question involving expert opinion is here presented, and it is well here to note that, as stated by Wigmore, the receiving of expert opinions rests upon a different theory than that relating to the opinion of a nonexpert.

Matters of law are not proper subjects for expert opinion, for, to again quote Wigmore, "It is easy to see

that on principle the opinion of no witness whatever is needed to tell the Court whether testamentary capacity existed, because that is a matter of applying a legal definition to the data of the testator's mental condition, and the judge (in theory) needs no assistance on that point, even from a ·legal witness. The data of the mental condition are to be presented, and the jury, under the judge's instructions, are to apply the definition to them." VII Wigmore on Evidence 88, § 1958. See also Brown v. Mitchell, 88 Tex. 350, 31 S.W. 621, 36 L.R.A. 64.

■■■ Further, the expert in stating his opinions must be restricted to his particular field, which is limited by the superior knowledge, experience or education possessed by him as compared with that of the jury. There are also certain inferences or fact conclusions which must be drawn by a jury alone and no expert is deemed qualified in law to express an opinion embracing these matters. The expert may not take inferred facts properly stated by him and combine them with an inference which he is not authorized to make and thus arrive at a further inclusive conclusion or opinion.

There is apparently some confusion between the rule excluding opinions as to matters of law and that which precludes the expert from stating an opinion which is necessarily based upon a fact inference which he is not qualified or authorized to draw. In discussing the latter rule, courts in excluding the opinion sometimes refer to the same as affecting "the very issue before the jury," or as "being an opinion upon the ultimate fact to be determined by the jury." The terms employed are somewhat misleading. For example, in a trial upon special issues, if one of the controlling issues be whether or not defendant stopped his automobile at a road intersection, it would hardly be contended that the defendant could not testify that he did stop at the place mentioned.

We may take a further example involving opinion evidence from the record in this case. No eyewitness testified that Mrs. Bates actually wrote the will and codicil here involved. The court submitted the following question to the jury:

"Question No. 1: Do you find that the instrument dated August 10, 1930, and offered in evidence as the last will and testament of Nellie Burgle Bates, was wholly written and signed by her? * * *

"In connection with the above issue, you are instructed that the burden of proof is upon L. A. Adamson, the proponent, to prove that the instrument was wholly written and signed by Nellie Burgle Bates by the testimony of two witnesses to ·her handwriting."

■■■ Testimony as to handwriting, other than testimony relating directly to the act of inscribing, is opinion evidence. VII Wigmore on Evidence, 3rd Ed. 186, § 1996.

After a lengthy dispute as .to whether the witness T. B. Blanchard was qualified or not, he was permitted to answer that he "recognized the will as being written in her (Mrs. Bates') handwriting."

Mrs. Alverda Butler, after detailing earlier experiences with Mrs. Bates' handwriting, testified that the will was in "Mrs. Bates' writing." Similar testimony was adduced with reference to the codicil.

■■■ Clearly in this instance, laying aside the question of qualification, the evidence as to handwriting was admissible despite the fact that it was directly upon an issue submitted to the jury.

However, in the report of Phœnix Ins. Co. of London, Ltd., v. Stobaugh, Tex.Civ. App., 62 S.W.2d 678, 679, will be found an example of an opinion which is objectionable as involving an inference which the expert is not authorized to draw.

"Several witnesses, expert in the building trade, were permitted over the objection of appellant to testify in substance that. a reasonably prudent owner, uninsured and desiring to rebuild appellee's house, would not have used the remnants left standing after the fire as a basis for the restoration of the building to the condition it was in before the fire."

■■■ It is apparent that expert opinion evidence of those skilled in the building trade is admissible upon the question of the strength, value, etc., of the remaining portion of building standing after the fire, but the inference or conclusion as to what a reasonably prudent owner, etc., would do, is obviously one which the jury is in as good a position to make as is the expert. In fact, the jury, as the trier of fact issues, is the only body authorized to draw this particular conclusion. While matters of law are never the subjects of expert testimony, matters of fact may or may not be the subject of expert testimony even when they involve an issue which must be answered by a jury. The objection that the

opinion of an expert is upon the ultimate issue of fact to be determined by the jury is only good when in so doing the expert states a conclusion necessarily based upon an inference which he is unauthorized to make, as above pointed out.

This seems clear under Supreme Court authority. In Houston & Texas Central R. Co. v. Roberts, 101 Tex. 418, 108 S.W. 808, 809, Mr. Justice Williams said: "All evidence is admitted to put the jury in possession of the facts over which they are to decide. It is sometimes the case that witnesses are permitted to state their opinions so as to involve the very conclusion the jury are to draw in giving their verdict. For instance, the question to be decided by the jury may be whether or not a person was insane, or whether or not a wound caused a death, or as to the value of property, and their decision of it may determine the entire controversy, but that does not exclude opinions of qualified witnesses upon it. Scalf v. Collin County, 80 Tex. 514, 16 S.W. 314. These and the like are pure questions of fact upon which opinions are admissible, and differ from such inquiries as that before us, where the ultimate conclusion to be drawn from all the facts of the case is a mixed one of law and fact as to negligence vel non, the facts determining which may be developed so as to enable the court and jury to decide it. Some of the facts from which the conclusion in this case was to be drawn might doubtless have been shown by opinions of witnesses, such as distance, speed of trains, time required for particular things, etc., but not the ultimate conclusion as to negligence or ordinary care."

In Beasley v. Faust, 217 S.W. 179, 181, this Court said: "It is, of course, possible to have a witness state his opinion concerning the ultimate fact issue to be found by the jury, so that, if the jury found such opinion to be correct, and applied the law to such fact, the entire case would be settled. It might have been contended that the opinion expressed by Dr. Treon is in effect an opinion that on the date of the execution of the note and deed of trust defendant was not conscious of the effect his acts would have on him, and that therefore necessarily he expressed the opinion that defendant was not conscious of the effect the execution of the note and deed of trust would have on him. Looking at the matter from this standpoint,

the objection might have been urged that the opinion was one upon the ultimate fact to be determined by the jury. However, as we understand our decisions, that objection is not tenable if the opinion relates to a matter within the scope of expert testimony. Scalf v. Collin County, 80 Tex. 514, 16 S.W. 314; Houston & T. C. [R. Co.] v. Roberts, 101 Tex. 418, 108 S.W. 808; Galveston, H. & S. A. R. [Co.] v. Stoy, 44 Tex.Civ.App. 448, 99 S.W 135."

American Jurisprudence is in accord with the rule as stated by the Texas authorities mentioned.

"It clearly will not do to accept too literally or as universal the rule that opinion testimony cannot be permitted to be given upon an ultimate issue and thus invade the province of the jury. Apparently, the rule has never been regarded as an inflexible one. It is certainly contrary to the unmistakable trend of authority to exclude expert opinion testimony merely upon the ground that it amounts to an opinion upon ultimate facts. The modern tendency is to make no distinction between evidential and ultimate facts subject to expert opinion. The courts consider that it is more important to get to the truth of the matter than to quibble over distinctions in this regard which are in many cases impracticable. Accordingly, in many cases expert witnesses have been permitted to state facts known to them because of their expert knowledge, even though their statements may involve the ultimate fact to be determined by the jury. In support of this view, it has been said that the giving of an opinion by an expert upon an ultimate fact which the jury are to determine does not invade the province of the jury any more than does the testimony given by an eyewitness as to any other decisive fact. In many cases the distinction is disregarded to the extent that no point is made thereon although the witness is allowed to testify directly on the ultimate issue, or else the exclusion of the testimony has been based also upon additional objections, as that the testimony was not based on a hypothetical question, which, manifestly, relates rather to the right to give an opinion on the evidence as such, or to the extent that it involved a mixed conclusion of law and fact. Furthermore, it is to be noted that many cases which express the idea that opinion testimony is not admissible to prove the ultimate fact in issue are merely applying the gen-

eral principle excluding opinion testimony where there is no necessity therefor. In no case where the point to be determined may be as accurately decided by the jury as by an expert, and where no technical or scientific knowledge is necessary in order to arrive at a conclusion based upon given facts, should an expert witness be permitted to express his opinion as to the ultimate conclusion." 20 Am.Jur. 654, § 782.

See also VII Wigmore on Evidence, 17, 18, §§ 1920, 1921; McCormick & Ray, Texas Law of Evidence, p. 807.

Tested by the applicable rule above set out, we do not believe it can be said that Dr. Johnson in stating the opinion objected to necessarily drew an inference he was unauthorized to make, or one which a jury was as well qualified to draw as he was. Insanity is a well-recognized field of the medical expert. The specialist in mental and nervous diseases is obviously better qualified than is a member of a jury to diagnose and classify mental disorders and state his inferences as to the incidents and consequences of disease as affecting the mental status of the person afflicted. The opinions or inferences of an expert are not inadmissible in evidence by reason of the fact that one or more of said inferences must be accepted by a jury or inferences similar thereto must be drawn by it prior to the jury's reaching the ultimate conclusion that a person lacked testamentary capacity.

The above holding is regarded by us as being conclusive upon this part of the case. Appellant, however, relies primarily upon such cases as Brown v. Mitchell, 88 Tex. 367, 31 S.W. 621, 36 L.R.A. 64, and Pickering v. Harris, Tex.Com.App., 23 S. W.2d 316.

We hope to make clear the distinction between an expert's stating an improper fact inference or opinion on one hand, and an expert's stating an opinion involving a matter of law on the other hand. Brown v. Mitchell and Pickering v. Harris are "legal conclusion" cases.

The holding of Brown v. Mitchell, supra, is that an expert (or any other type of witness for that matter) may not state a legal conclusion or an opinion involving a matter of law. The rule is stated in Corpus Juris Secundum, particularly with reference to medical experts as follows: "A medical witness may state his opinion as to the mental capacity or condition of a person observed by him, or he may testify in response to hypothetical questions; but in stating his opinion the medical witness may not apply legal tests." 32 C.J.S., Evidence, p. 252, § 535.

The rule prohibiting opinions involving legal conclusions is simple enough in the statement, but, as Dean Wigmore has pointed out, "in distinguishing between proper and improper forms of statement an easy opportunity is offered for judicial quibbling," and there is great contrariety of opinion among the American authorities. VII Wigmore on Evidence, 3rd Ed., 89–92, § 1958. In certain cases the question can not be resolved upon the form of the question and nature of the answer also. McDaniel v. Willis, Tex.Civ.App., 157 S.W.2d 672. It is stated in Corpus Juris that "the distinction between the two classes of cases (some holding certain opinions admissible and some holding similar opinions inadmissible) will probably be found in a consideration of whether the witness was really attempting to usurp the functions of court or jury, or was merely stating, in his own way, an opinion as to a mental condition." 22 C.J. 669, § 760. See, also, 32 C.J.S., Evidence, § 535. Consequently, an opinion apparently involving a legal conclusion, when viewed by itself, may be properly regarded as the expression of an opinion as to a mental condition, when examined in connection with the evidence of which it is a part.

The statement of a test applicable here is given by Mr. Justice Moursund of this court in the following excerpt from Beasley v. Faust, Tex.Civ.App., 217 S.W. 179, viz: "By the second assignment of error complaint is made because the court permitted Dr. Treon to testify that defendant from about 1912 to the date of the trial would not be conscious of the effect his acts would have on him or surrounding circumstances. In addition to the objections to the qualifications of the witness above considered, the further objection was urged that this testimony 'was a legal conclusion of the witness.' The testimony is not subject to the objection that the witness was stating a legal conclusion. No knowledge of any rule of law was necessary in order to answer the question. The answer involved only an opinion concerning the extent or degree of the mental unsoundness of defendant. * * * To make a valid will or contract a certain

amount of mental capacity is required by the rule of law to be applied in testing the validity of the transaction, and for a witness to say that a person has the requisite capacity implies that such witness knows the rule of law and is applying it in arriving at his conclusion. It seems obvious that to state that a person 'would not be conscious of the effect his act would have on him' does not imply that the witness has attempted to apply a legal definition to test the validity of any act of the person."

We do not believe that it can be said in the light of the evidence, that before Dr. Johnson stated his opinions in answer to the questions heretofore set out it was necessary for him to apply, nor did he apply, some legal definition in arriving at his conclusions. We consequently conclude that his opinions were not objectionable as embracing "legal conclusions."

Appellant places much emphasis upon the case of Pickering v. Harris, Tex.Com. App., 23 S.W.2d 316. As above indicated, we regard Pickering v. Harris as being a "legal conclusion" case. It does not deal with the other phase of the opinion rule, which precludes that statement of fact conclusions by an expert under certain circumstances heretofore mentioned. From the holdings of the Pickering case that certain witnesses' opinions involved legal conclusions, it does not follow that the opinions expressed by Dr. Johnson in this case (and objected to by appellant) also embrace legal conclusions. Appellant's argument is not bottomed on that premise, but rather upon the theory that Dr. Johnson expressed opinions directly upon issues which were submitted to the jury. This contention by appellant has been heretofore discussed.

There remains one further matter to be discussed. In Pickering v. Harris, supra, the Commission of Appeals construed Brown v. Mitchell as overruling the holding in Scalf v. Collin County, 80 Tex. 514, 16 S.W. 314, upon the question of the admissibility of opinions involving legal conclusions. However, we do not understand that the Scalf case has been overruled, insofar as its holdings upon other points are concerned. In Houston & Texas Central R. Co. v. Roberts, 101 Tex. 418, 108 S.W. 808, the Supreme Court, as shown by the excerpt above quoted, cites the Scalf case as authority for its holding upon the point involving fact inferences as distinguished from legal conclusions. Houston & T. C. R. Co. v. Roberts was decided in 1908, while Brown v. Mitchell was decided in 1897. Consequently, Brown v. Mitchell can hardly be construed as overruling Scalf v. Collin County upon the very point for which it was cited as authority by the Supreme Court in 1908.

Having concluded that appellant's brief discloses no reversible error, the judgment of the trial court is affirmed.