Waggoner CARR, Attorney General of the State of Texas, Petitioner,

v.

Oliver RADKEY et al., Respondents.

No. A–10554.

Supreme Court of Texas.

July 28, 1965.

Rehearing Denied Oct. 6, 1965.

Waggoner Carr, Atty. Gen., Austin, J. Arthur Sandlin, Asst. Atty. Gen., for petitioner.

Arthur P. Bagby and John C. Foshee, Austin, John E. Allen, Alpine, J. C. Hinsley, T. B. Kellum, Austin, for respondents.

GREENHILL, Justice.

This is a will contest. Upon a finding by the jury that Miss Hattie Hewlett did not have testamentary capacity, the trial court denied probate to her holographic wills of April 17 and December 28, 1936. The only serious contest was and is over the instrument of December 28, 1936. Except for procedural problems later noticed, this opinion will deal only with the December 28 will.

The State appealed on the ground that it (and those aligned with it in support of the will) had not been given a fair trial because of the exclusion of what they regarded as their most important evidence, the testimony of Dr. Sam Hoerster, an expert in mental illnesses. The evidence which was excluded was Dr. Hoerster's opinion, in answer to a hypothetical question, as to whether Miss Hewlett, when she wrote her will, had sufficient ability to understand the business in which she was engaged, the effect of her acts in making the will, realized what she was doing, knew her people and relatives, and knew the property she owned. Also excluded was his answer to a question as to whether Miss Hewlett wrote the will during a lucid interval. Outside the hearing of the jury, in completing a bill of exceptions, Dr. Hoerster answered both questions in such a way as to support the probate of the will.

The Court of Civil Appeals did not pass on whether it was error to exclude Dr. Hoerster's testimony. The majority of that court was of the opinion that the error, if any, in the exclusion of the evidence was not harmful because of other evidence given by Dr. Hoerster. 384 S.W.2d 736 (1964). The dissenting justice was of the opinion that it was error to exclude the evidence and that its exclusion was harmful. 384 S.W.2d at 744.

Miss Hewlett wrote the will when she was 62 years of age, while in the Brown Rest Home in Austin. Before she became mentally ill, she had supported herself and had been in charge of the safety deposit boxes at the American National Bank in Austin. She lived close to the university's campus. She had made investments in Austin real estate, some of them relatively close to the time of her mental illness, which proved to be profitable. Her estate was appraised at $240,000 upon her death in 1960.

The instrument of December 28, offered as her last will, is set out in the opinion of the Court of Civil Appeals. 384 S.W.2d at 738–739. The jury found it to have been written in her own handwriting. A few weeks before December 28, 1936, she had been taken against her will to the Brown Rest Home and confined in a solitary room without any legal form of commitment or finding of lack of mental capacity. There is nothing in the will itself to evidence any mental illness or insanity. It is in proper form. Without in any manner here attempting to construe the will, it may be said that in general it creates a trust for the benefit of five named nieces and nephews and their issue for a period of time with remainder to be used for five scholarships: in law, music, business administration, education and home economics for worthy students of The University of Texas. Because of this latter charitable bequest, the Attorney General is in the case in defense of the will.

Miss Hewlett died in 1960, some 23 years after the execution of the will of December 28, 1936. She spent several years of

that period of time in the Brown Rest Home. She had very few visitors during these 23 years; and because of the great lapse of time since 1936 when she executed the instrument, the witnesses had difficulty in remembering with accuracy how she acted about the time of the execution of the instrument. The proprietor, a Mr. Bert Brown, had lost "his book" which covered this period. It is fair to say, however, that Mr. and Mrs. Brown who operated the rest home, as well as some others, gave testimony which would clearly support a jury finding that Miss Hewlett did not have testamentary capacity at the time she wrote the instrument. As will be later discussed, there was evidence that Miss Hewlett was subsequently declared by the County Judge to be non compos mentis on January 18, 1937; and a guardian was appointed for her at that time. The admission of this evidence is the subject of a point of error.

The testimony of Dr. Hoerster, not objected to, was that from the symptoms described, Miss Hewlett was suffering from a mental illness which would cause her to be diagnosed as a manic depressive. Such a person has periods of great stimulation, the manic period. During such periods she would, according to the Browns, talk or jabber continuously, tear the wallpaper off the wall, tear her clothes, hide her food, beat on the wall, and the like. In the periods of depression, she would sit silently, sometimes on the floor, and refuse to talk or eat. There were also periods when Miss Hewlett "was very nice." She would be taken to a picture show or for a ride in an automobile. In 1939, she accompanied the Browns on an automobile trip through eight states.

The periods of mania and depression suffered by Miss Hewlett made relevant testimony as to (1) whether people suffering with such mental illness have periods of remission, and (2) whether Miss Hewlett was in such a period when she executed the instrument on December 28, 1936. Dr. Hoerster explained that "a remission is a period of absence of the illness, when the illness goes away, apparently. It actually is not—does not necessarily mean a cure, but it is a time when the illness is not active."

We will assume that there is evidence to support a jury finding of want of capacity to execute the will, and we need not set out any more of that evidence. We are concerned mainly with whether there was harmful error in excluding Dr. Hoerster's testimony as to his opinion about Miss Hewlett's condition at the time she executed her will.

Mrs. Radkey, wife of respondent Dr. Oliver Radkey, was permitted to testify over objection of the Assistant Attorney General, that based on her personal observation of Miss Hewlett on January 12, 1937, Miss Hewlett was not mentally capable of knowing and understanding the nature of her acts. This testimony was brought out by counsel for Dr. Radkey, a contestant of the probate of the will.

The next witness, S. P. Kinser, an Austin real estate man, over objection, expressed the conclusion that Miss Hewlett was not of sound mind, and for that reason he would be afraid of any title to real estate conveyed by her. The nurse at Brown's Rest Home, Mrs. Dearing, testified without objection that in her opinion Miss Hewlett was of unsound mind in December, 1936. Mrs. Dearing was the sister of Mr. Brown, operator of the rest home.

These opinions were expressed to the jury before Dr. Hoerster was called to the stand. He had not seen and did not know Miss Hewlett. He, however, had received specialized training in mental diseases and psychiatry and had been with the State Hospital System since 1950. As Superintendent of the Austin State Hospital since 1955, he had under him some 50 physicians on a full-time basis. The hospital admitted about 5,000 patients a year. They had on hand about 3,000 at the time of trial. He actively participated in treat-

ing the patients. His qualifications as an expert witness in the field of mental illnesses were not challenged.

After being so qualified, Dr. Hoerster was asked a hypothetical question. As a predicate to the question, counsel reviewed the evidence about Miss Hewlett, including the fact that she had been taken to a rest home in the latter part of 1936. He was told of her periods of excitement and depression. He was told that her brother, David Hewlett, had died, and that she was informed of his death on December 28, 1936, the same day on which her will is dated; she showed no emotion. Her will was read to Dr. Hoerster. Assuming these facts, he was asked whether Miss Hewlett, when she wrote the will, "had sufficient ability to understand the business in which she was engaged, the effects of her acts in making the will, realized what she was doing, knew her people and her relatives, and knew the property she owned." He was not permitted to answer. The court also sustained objections to other questions breaking down the larger question into various elements.

The doctor was then asked if he had an opinion as to whether she was of unsound mind. He testified that he did think she was of unsound mind in that she had a mental illness "which fluctuates between one end of the mood scale to the other. In other words, that she had periods of elation or manic behavior and periods of depression; and that her thinking probably went along with her mood, and that at times would be quite rational, and at other times, not; but this manic depressive—I would consider her to have had a manic depressive illness, psychosis." He continued, "I think she was mentally ill, but was of this type that would have fluctuations in her mood, where she would be quite lucid and then sometimes would be quite depressed and then at other times be elated."

He was asked whether the writing would indicate that she was experiencing a lucid interval when she wrote the will. He was not permitted to answer.

Outside of the hearing of the jury, Dr. Hoerster testified that in his opinion Hattie Hewlett, when she wrote the will, did have sufficient ability to understand the business in which she was engaged, the effect of her act in making the will, realized what she was doing, knew her people and her relatives, the property she owned, and the objects of her bounty. He also testified that in his opinion the will was written during a period of remission.

Thereafter, Mrs. Brown was permitted to testify that in her opinion Miss Hewlett was not mentally capable on December 28 of knowing the nature and effects of her acts.

Respondents contend that the error, if any, in excluding the answers of the doctor was harmless because he gave other testimony which furnished the answers to the questions. That testimony was admitted in the following context:

After the court sustained respondents' objections, Dr. Hoerster was asked if he thought a person in Miss Hewlett's condition was of sound mind when she wrote such a document. He said it depended upon the definition of "unsound mind." He thought such a person was mentally ill and hence was of unsound mind; that such a person would have the periods of elation and depression; that sometimes such a person would have a good memory and be quite lucid. This was followed by the question of whether the writing of the document would indicate a lucid interval. Objection to this was sustained.

Then the doctor was again asked if in his opinion a person in Miss Hewlett's condition was of sound mind. He said, "I think she was of unsound mind in my definition of it." He repeated that in many cases such persons might at times be able to understand the nature of their business, the nature of their property, and the natural objects of their bounty in the disposition

of their property. He did not mean, he said, that everyone of unsound mind had all of these facets; and that such a person could at some time, though not necessarily all the time, be mentally capable of knowing and understanding his relationship to his next of kin. Then counsel again put the hypothetical question to the doctor as to whether the subject of the question "was not mentally capable to understand the business in which she was engaged on or about the 28th of December, 1936." Objection was sustained. He was asked if "she was mentally capable and had sufficient mind to understand the effect of her acts in making a will." Objection was sustained. Objection was also sustained as to whether she might have been between a manic and a depressed state so as to be mentally capable of knowing or understanding the nature and effect of the business in which she was engaged.

We hold that the exclusion of the evidence was error. There has been confusion in the Texas cases as to what questions may properly be asked of lay or expert witnesses in a contest regarding the capacity of a testator or a grantor. The conflicts are recognized in able articles by Stout, *Some Problems in the Trial of a Will Contest,* 7 Baylor Law Review 121 (1955), and Marschall, *Opinion Testimony on Testamentary Capacity,* 25 Texas Bar Journal 385 (May 1962). The confusion stems from a failure to distinguish (1) testimony relating purely to legal capacity, a question involving legal definitions, and (2) testimony relating to mental condition.

In Pigg v. State, 43 Tex. 108 (1875), it was held to be error to exclude a physician's opinion as to whether the defendant was of sound or unsound mind. In Scalf v. Collin County, 80 Tex. 514, 16 S.W. 314 (1891), the problem was whether the grantor had capacity to execute a deed. Witnesses were permitted to testify whether they thought the grantor was of sound or unsound mind. Then a lay witness who had observed the grantor was asked whether in her opinion the grantor had "mental capacity sufficient

to understand the nature and effect of such deed." The question was answered affirmatively. This Court held that it was correct for the testimony to have been allowed, saying:

> "When the issue is one upon which the witness may properly state his opinion, he may do so, notwithstanding his answer embraces the very issue on trial. * * * The right to express an opinion includes the right to give it as to the degree or extent of the mental infirmity, and to apply it to the particular matter in controversy." 16 S.W. 314, 315.

Then came Brown v. Mitchell, 88 Tex. 350, 31 S.W. 621, 36 L.R.A. 64 (1895). In that will contest, the question was asked whether in the witness's opinion, Lizzie Brown had sufficient mental capacity to make and declare her last will and testament. Justice Stayton for this Court held that the question was a proper one; and the cause was remanded for a new trial. Upon the subsequent appeal, Justice Stayton no longer being on the Court, this Court overruled its former opinion. It was held that the question was one of the *legal capacity* of Lizzie Brown to execute the will. The Court emphasized that a witness, lay or expert, might have a different opinion or understanding as to what *legal* capacity to perform the act was. The Court concluded that "no witness [lay or expert] * * * will be permitted over proper objection, to state his opinion of the capacity of the testator * * * when such opinion assumes the shape and has the effect of being an opinion upon the *legal capacity* of the party in question." 31 S.W. 621, 628. The Court in Brown v. Mitchell did not cite or refer to Scalf v. Collin County.

This Court recently followed Brown v. Mitchell when the witness was asked a question involving the legal definition of an insane delusion. A doctor was not permitted to answer a question as to whether the testatrix was under an insane delusion when she executed her will. Lindley v. Lindley,

384 S.W.2d 676 (Tex.Sup.1964). The Court reasoned that "a doctor's concept of what constitutes an insane delusion may be quite different from the legal concept." The question involved the application of a legal definition. This same reasoning was applied in Knight v. Edwards, 153 Tex. 170, 264 S.W.2d 692, 696. See also Jackson v. Watson, 10 S.W.2d 977 (Tex.Com.App. 1928), where it was held that the witness should not have been permitted to testify that in his opinion "the said Jackson was mentally competent to execute the deed * * *." Here again the testimony related to legal competence and involved a definition of competence. The difficulty has come when the question is one concerning the mental capacity or condition of the testator, and the question is one not involving a legal definition.

After Brown v. Mitchell, there were several cases by the Courts of Civil Appeals which fell to both sides of the matter: whether the questions involved a legal definition of capacity or were directed to mental condition. Then came the case which caused much of the difficulty. It was Pickering v. Harris, 23 S.W.2d 316 (1930), an opinion of the Commission of Appeals which was not adopted by this Court. In that suit to cancel a deed, various witnesses were asked: did the grantor understand that he was transferring the property; did he have mental capacity sufficient to understand the nature and extent of the transaction; and whether he knew the nature and extent of the property he owned. It was held that under Brown v. Mitchell, these questions were improper. The Commission of Appeals said that these questions were permissible under Scalf v. Collin County by this Court, set out above; but it stated that this Court, while not mentioning the Scalf case in Brown v. Mitchell, had overruled Scalf in Brown v. Mitchell. The Commission in Pickering v. Harris said these questions (1) invaded the province of the jury, and (2) amounted to legal conclusions. While the witness in Brown v. Mitchell was asked the single legal conclusion involving a legal definition, the court in Pickering v. Harris said the same thing could not be done by asking several fragmented questions all amounting to the same legal conclusion.

After Brown v. Mitchell, this Court cited the Scalf opinion with approval in Houston & T. C. Ry. Co. v. Roberts, 101 Tex. 418, 108 S.W. 808, 810 (1908). And in an able opinion by Mr. Justice Norvell, it is stated that the Commission of Appeals was wrong in Pickering v. Harris in concluding that Brown v. Mitchell overruled Scalf. Adamson v. Burgle, Tex.Civ.App., 186 S.W.2d 388, 400. This Court refused the application for writ of error in Adamson v. Burgle for want of merit. The particular questions held to be admissible in Adamson v. Burgle were asked of a doctor: would the testatrix "have been able to know anything intelligently about any business transactions she might have had? * * * Would she have been able * * * to make an estimate of the type and character ·and the amount of her estate and those who would naturally be entitled to her bounty?"

We now examine the reasons given in Pickering v. Harris for excluding the testimony: it invades the province of the jury, calls for an answer to the ultimate question, and constitutes a conclusion.

In Federal Underwriters Exchange v. Cost, 132 Tex. 299, 123 S.W.2d 332 (1938), a doctor in a workmen's compensation case was asked if the disabling condition of the plaintiff was permanent; whether the workman would thereafter be able to procure and retain employment. The objection was that this question [and the answer thereto in the workman's favor] invaded the province of the jury; that it asked the ultimate question to be answered by the jury. Brown v. Mitchell and Pickering v. Harris were cited. Judge Smedley for this Court said those cases were limited to the questions involving legal conclusions [legal definitions]. Whether a person is totally incapacitated, the Court said, was a question of fact. And Pickering v. Harris was

construed as being limited to the narrow question of a legal conclusion as to the ultimate issue in the case.

It is understandable that the bench and bar have been unable to reconcile these holdings. A. R. Stout in his article previously referred to, Some Problems in the Trial of a Will Contest, 7 Baylor Law Review 121 (1955), recognizes the conflicts and concludes that Adamson v. Burgle is the better view, "but such cases as Pickering v. Harris, supra, should not be overlooked and it must be remembered that Brown v. Mitchell has never been cited by the Supreme Court in a will case, on the direct question involved, since the day it was written * * *." [Lindley v. Lindley, supra, had not then been written.]

The question of a witness, lay or expert, being allowed to answer questions regarding the capacity of a testator has been given considerable attention by persons regarded as authorities in the field. They have considered and discussed the objections to the admission of the testimony which fall into these general categories: (1) it invades the province of the jury; (2) the witness is asked to answer a question the jury must answer, or the ultimate issue; and (3) the witness, lay or expert, may not have in mind the same definition of capacity to execute an instrument as is contained in the legal definition of capacity. These textwriters and authorities are almost uniform in their criticism of using "invasion of the province of the jury" as a reason for excluding testimony in this area. The function of the witness is to give information which will be helpful to the jury. The province of the jury is to believe or disbelieve, weigh evidence, and to evaluate it. The witness could not invade that province if he wanted to. Wigmore says the phrase "is so misleading, as well as so unsound, that it should be entirely repudiated. It is a mere bit of empty rhetoric." 7 Wigmore, Evidence 17 (3d ed. 1940). McCormick says the phrase if taken literally is absurd. It suggests that the jury may forego independent analysis and bow too readily to the

opinion of an expert or otherwise influential witness. McCormick, Evidence 25–28 (1954). This indicates a mistrust of the mentality and capacity of jurors to decide matters for themselves. See Norvell, Invasion of the Province of the Jury, 31 Texas Law Review 731 (1953).

Regarding the second objection, that the juror is asked the ultimate question the jury must answer, Mr. Justice Smedley held for this Court in Federal Underwriters Exchange v. Cost, 132 Tex. 299, 123 S.W.2d 332 (1938), discussed above, that there are many occasions on which a witness may be asked the same question the jury must answer. For example as in Cost, a doctor was permitted to give his opinion as to whether an incapacity of a workman would be permanent. Again, an automobile intersection case may turn on whether a party ran a red light, failed to stop at a sign, gave a particular signal, and the like. In all of these, witnesses may testify, if they know, that the person did or did not do these things; and the jury is then asked the same question. Many authorities would permit questions even on an ultimate issue. See McCormick, The Opinion Rule and Expert Testimony, 23 Texas Law Review 109, 115 (1945); Slough, Testamentary Capacity, Evidentiary Aspects, 36 Texas Law Review 1, 11 (1957); Ladd, Expert Testimony, 5 Vanderbilt Law Review 414, 423 (1952); 7 Wigmore, Evidence 18 (3d ed. 1940). It is when the question involves a legal definition and a conclusion based on the definition that Brown v. Mitchell and Lindley v. Lindley, 384 S.W.2d 676 (Tex.1964) are offended.

It is the third objection listed above which is the basis for the holdings of Brown v. Mitchell and Lindley v. Lindley. A witness may not be asked whether a person had the [legal] capacity to execute a deed, or was acting under an insane delusion when he executed his will, because these concepts involve legal definitions. As stated in Lindley, the doctor's or lay witness's definition or understanding of capacity to

perform the act in a legal manner may be different from the legal standard.[1] 2 McCormick and Ray, Texas Law of Evidence 256, § 1421 (2d ed. 1956).

■ It is our conclusion that the jury in cases such as these should be given all relevant and competent testimony with regard to the mental condition of the testatrix; and in our opinion, competent evidence about her mental condition and mental ability or lack of it which does not involve legal definitions, legal tests, or pure questions of law should be admitted. This is in accord with the modern trend in this field. Slough,[2] Testamentary Capacity: Evidentiary Aspects, 36 Texas Law Review 1 (1957); Ladd,[3] Expert Testimony, 5 Vanderbilt Law Review 414, 423 (1952); Norvell, Invasion of the Province of the Jury, 31 Texas Law Review 731, 740, 742 (1953); Model Code of Evidence rule 401 (1942); Grismore v. Consolidated Products, 232 Iowa 328, 5 N.W.2d 646 (1942).

This has also been the trend of the better cases in Texas. In Chambers v. Winn, 137 Tex. 444, 154 S.W.2d 454 (1941), several witnesses were asked if they thought the testator was of sound or unsound mind. Objection was sustained. This Court reversed, saying that "[t]he courts below failed * * * to observe the distinction between evidence bearing on the mental condition of the testator and that bearing on his legal capacity to make a will."

There are several well-considered opinions of the Courts of Civil Appeals which follow this view. See Fox v. Lewis, 344 S.W.2d 731 (wr. ref., n. r. e., 1961), in which the questions permitted were whether grantor could understand the nature and extent of her property, the effect of the disposition of it, and whether she had the mental capacity to understand the nature and extent of her property. See also McDaniel v. Willis, 157 S.W.2d 672 (Tex.Civ. App. wr. ref., 1941) and Adamson v. Burgle, 186 S.W.2d 388 (Tex.Civ.App. wr. ref., w. o. m., 1945).

■ As stated, the case which has caused the difficulty in the Texas cases is Pickering v. Harris, 23 S.W.2d 316 (Tex. Com.App.1930). It is out of line with the Supreme Court case of Scalf v. Collin County by this Court, and it is out of line with the better opinions of the Courts of Civil Appeals of recent times in which this Court has denied writ of error. It was criticized shortly after it was written in a casenote by Byron G. Skelton, 8 Texas Law Review 589; and it was criticized by Dean McCormick in his article in 23 Texas Law Review 109, 120 n. 35. While attempts have been made to distinguish and explain the Pickering case, we are of the opinion that it is incorrectly decided and should be overruled. It is accordingly overruled. Our holding is that a witness may not be asked whether a testator had the mental capacity to make and publish a will because, under Brown v. Mitchell, whether a person has mental capacity to execute a will involves a legal definition and a legal test. A witness may be asked, assuming he knows or is a properly qualified expert, whether the testator knew or had the capacity to know the objects of his bounty, the nature of the transaction in which he was engaged, the nature and extent of his estate, and similar questions.

■ The particular question here was whether Miss Hewlett, when she wrote her will, had sufficient ability to understand the business in which she was engaged, the effect of her acts in making a will, realized what she was doing, and knew the property

---

1. It has been argued by many of the authorities set out above that any difference of definition could be brought out by proper cross examination; and so the question and answer should be allowed if it would be helpful to the jury. Nevertheless, this Court's position is stated in Brown v. Mitchell and followed in Lindley.

2. M. C. Slough was Dean of the School of Law, the University of Kansas.

3. Mason Ladd is Dean of the School of Law of the University of Iowa.

she owned. The trial court erred in excluding the question and the answer thereto.

We are also of the opinion that the error was harmful. While Dr. Hoerster, the only medically trained expert tendered by either party, did get in bits of testimony here and there, he was never permitted to develop his testimony, the Petitioner's side of the lawsuit, after he had answered that in his opinion Miss Hewlett was of unsound mind. At least three of Respondents' witnesses were permitted to testify that in their opinion Miss Hewlett was of unsound mind, giving their reasons. Mrs. Radkey had been permitted to testify that in her opinion the testatrix was not mentally capable of knowing or understanding her acts. Similarly, Mrs. Brown was permitted to testify that Miss Hewlett was not mentally capable of knowing the nature and effect of her acts. The Petitioner was entitled to meet that evidence with Dr. Hoerster's testimony.

■ It was also error to exclude the testimony of Dr. Hoerster that in his opinion the will was executed during a period of remission in Miss Hewlett's mental illness. He stated what he meant by a period of remission, and no legal test or definition was involved. This error was likewise harmful.

### A Sensible Holographic Will Is Not Self-Proving

The State contends that the sensible holographic will of Miss Hewlett proves itself; and that, as a matter of law, it should have been admitted to probate. There is a statement in 94 C.J.S. Wills § 63, p. 769, which says, "When an insane person writes his own will in his natural manner, and the provisions are sensible, proper, and judicious, the will itself proves that it was written during a lucid interval." The text in 57 Am.Jur. 102, Wills § 96, states that there are cases which say that wise and

judicious provisions in a will, which is shown to have been drawn by the testator himself, create a presumption, even in the case of persons habitually insane, that the will was executed during a lucid interval. The cases cited are from Louisiana.[4]

This line of cases and others were cited with approval by two Texas Courts of Civil Appeals: McCannon v. McCannon, 2 S.W.2d 942, 944 (wr. dism., 1928); and Reiche v. Williams, 183 S.W.2d 587, 592 (1944). The latter case in its discussion quotes with approval this statement, "The strongest and best proof that can arise as to a lucid interval is that which arises from the act itself of making the will. * * * Here is a rational act, rationally done. * * * [and] where you are able completely to establish that, the law does not require you to go further."

In the Reiche case quoted from just above, there was evidence that the testator had capacity to execute the will, and the jury so found. The Court of Civil Appeals went further, however, and said that the validity of the will was established as a matter of law, using the language above quoted. It also said the evidence to the contrary amounted to no evidence. This Court refused the application for writ of error for want of merit with an opinion which said that the court below had reached a correct result based on the jury verdict; but it disagreed that the will was established as a matter of law. 143 Tex. 365, 185 S.W.2d 420 (1945).

■ We agree with the Court of Civil Appeals in Reiche v. Williams to the extent that a rational and sensible holographic will, prepared by a testator or testatrix, is evidence of the fact that the will was written during a lucid interval. We cannot agree, however, that the will establishes itself as a matter of law. Reiche v. Williams, 143 Tex. 365, 185 S.W.2d 420 (1945); In re Price's Estate, 375 S.W.2d 900 (Tex.

---

4. Succession of Schmidt, 219 La. 675, 53 So.2d 834; Kingsbury v. Whitaker, 32 La.Ann. 1055, 36 Am.Rep. 278.

1964). The legislature in 1955, long after this will was executed, made provision for self-proof of holographic wills. 17A Vernon's Ann.Texas Civil Statutes, Probate Code, § 60. Obviously the will in question does not come within that section of the new Probate Code. Our holding is that the will, even though sensible, does not prove itself.

### Admissibility of County Court's Subsequent Judgment That Miss Hewlett Was Non Compos Mentis

■ The will in question is dated December 28, 1936. Some three weeks thereafter, at the request of J. T. Hewlett, cousin of the testatrix, the County Court of Travis County appointed J. T. Hewlett guardian of the person and estate of Miss Hewlett. This action was taken without a jury, and the order recites that the action was taken for the protection of Miss Hewlett and her property. It contained a finding that she was of unsound mind, but it did not purport to authorize any commitment or confinement of Miss Hewlett. She was at that time already being held against her will in solitary confinement at the Brown Rest Home. An attorney ad litem was appointed for her seven days before the adjudication. He filed a general denial on her behalf and appeared for her.

At the beginning of this trial, the Respondents offered in evidence this action of the County Court. It was excluded. At the close of the trial, it was reoffered and was admitted on the ground that it had been invited: that Respondents had a right to show the order because of questions and statements by the State's counsel which indicated that Miss Hewlett had been wrongfully held in the Brown Rest Home, and had not been held under a court order, thus reflecting prejudicially upon Respondents.

While there is authority in some other jurisdictions that a subsequent adjudication that a person is of unsound mind is admissible in evidence on the question of testamentary capacity,[5] the Texas cases are uniformly to the effect that this evidence is not admissible. Uecker v. Zuercher, 54 Tex.Civ.App. 289, 118 S.W. 149 (1909, writ ref.); Black v. Boyer, 21 S.W.2d 1094 (Tex.Civ.App.1929, writ dism.); Wright v. Matthews, 130 S.W.2d 413 (Tex.Civ.App. 1939, writ dism., judg. corr.); Joy v. Joy, 156 S.W.2d 547 (Tex.Civ.App.1941, wr. ref., w. o. m.).

The inquiry before the court and jury was the mental capacity of Miss Hewlett. Her kin who had her committed and the Browns were not on trial. No damages were being sought for wrongful detention. Since the evidence in the subsequent guardianship proceedings was not admissible, it should not have been admitted at all.

It is undisputed that Miss Hewlett was not judicially committed. It has been held that before a person can be committed indefinitely to a state hospital, there must be a jury verdict not only that the person is of unsound mind, but that his mental condition is such as to render it necessary that he be placed under restraint. Hatton v. State Board of Control, 146 Tex. 160, 204 S.W.2d 390 (1947). It is also undisputed that Miss Hewlett was taken and held without her consent. She had been at the Brown Home at the behest of her brother a brief period before and had managed to "escape." She returned to her home. On the pretext of giving her a ride home from the grocery store, one member of the Brown Home staff drove the car while another slipped into the seat on the outside and pinned Miss Hewlett in the car. Then she was driven to the Home. Mrs. Brown, who was in the car, testified that Miss Hewlett, when she realized what

5. Milton D. Green, Proof of Mental Incompetency and the Unexpressed Major Premise, 53 Yale Law Journal 271, 286; M. C. Slough, Testamentary Capacity: Evidentiary Aspects, 36 Texas Law Review 1, 17; and Annotations, 7 A.L.R. 568, 569, and 68 A.L.R. 1309, 1311.

was happening, hollered, "Help! Help! I am being kidnapped."

 . The evidence of this occurrence and the facts regarding her stay at the Home, as well as her conduct in the Home, were admissible, and the State had the right to ask questions and comment on the answers. Upon another trial, the Court will, of course, have the power to control the extent of the questions and comments. But the evidence as to the guardianship proceedings and the finding that Miss Hewlett was of unsound mind after the will was written is not admissible under the Texas cases set out above.

There are other points of error. We have examined them and are convinced that they will probably not arise upon a retrial of this case.

The judgments of the courts below are reversed and the case is remanded to the district court for a new trial.

GRIFFIN, J., not sitting.