In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-00-00168-CV


______________________________







IN RE VERDIE NELL NEVILLE, DECEASED








 


On Appeal from the 5th Judicial District Court


Cass County, Texas


Trial Court No. 98-C-407




 




Before Cornelius, C.J., Grant and Ross, JJ.


Opinion by Chief Justice Cornelius



O P I N I O N



 In this will contest, Charles Neville and Paulette Knapp appeal from the trial court's
judgment which held that Verdie Neville did not have testamentary capacity on July 9, 1998, at the
time she signed a will, and ordered that a will Verdie Neville executed in 1992 should be admitted
to probate instead of her 1998 will. Charles Neville and Knapp contend that the evidence is factually
and legally insufficient to support the trial court's finding that Verdie Neville lacked testamentary
capacity when she executed the will of July 9, 1998. 

 In order to make a valid will, Verdie Neville must have been of sound mind when she signed
the will. See Tex. Prob. Code Ann. § 88(b)(1) (Vernon 1980). Texas courts define the term "sound
mind" to mean "testamentary capacity." 

 Testamentary capacity means sufficient mental ability to understand the business in which
the testatrix is engaged, the effect of her act in making the will, and the general nature and extent of
her property. The testatrix must be able to know her next of kin and the natural objects of her
bounty, and she must have a sufficient memory to collect in her mind the elements of the business
to be transacted and to hold them long enough to at least perceive their obvious relation to each other
and be able to form a reasonable judgment about them. Bracewell v. Bracewell, 20 S.W.3d 14, 19
(Tex. App.-Houston [14th Dist.] 2000, no pet.); In re Estate of Jernigan, 793 S.W.2d 88, 89 (Tex.
App.-Texarkana 1990, no writ); Lowery v. Saunders, 666 S.W.2d 226, 232 (Tex. App.-San Antonio
1984, writ ref'd n.r.e.). As proponents of the July 9, 1998 will, Charles Neville and Knapp had the
burden to show that Verdie Neville had the requisite testamentary capacity on July 9, 1998, the day
she signed the will. See Guthrie v. Suiter, 934 S.W.2d 820, 829 (Tex. App.-Houston [1st Dist.]
1996, no writ). 

 When an appellant attacks the legal sufficiency of an adverse fact finding on an issue for
which he had the burden of proof, he must demonstrate that the evidence established the contested
issue as a matter of law. Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983). In its analysis, the
reviewing court must examine the record for evidence that tends to support the finding, while
disregarding all evidence and inferences to the contrary. Sterner v. Marathon Oil Co., 767 S.W.2d
686, 690 (Tex. 1989). If there is no evidence to support the trial court's finding, then the entire
record must be examined to see if the contrary proposition is established as a matter of law. See id.

 Charles Neville and Knapp make a very narrow argument in this case. They contend that
because there is direct evidence of Verdie Neville's mental state on July 9, 1998, evidence of her
mental condition on surrounding dates cannot override that direct evidence, or even be considered
as proof of her condition on that particular date. 

 Charles Neville and Knapp rely on Lee v. Lee, 424 S.W.2d 609 (Tex. 1968), to support their
position. In that case, a jury found that an eighty-eight-year-old testator did not have testamentary
capacity. The witnesses to the execution of the will testified that Lee was competent when he signed
the will. The jury did not believe that testimony, instead believing other testimony-not about his
condition on that exact date-but instead describing the testator's dementia as exhibited over a period
of years. The court of appeals concluded that the contestant's evidence about Lee's prior mental
condition only created a suspicion of incapacity at intermittent periods not associated with the date
of the execution of the will. The Texas Supreme Court reversed the judgment of the court of
appeals, finding that there was some evidence that Lee was of unsound mind on the date he signed
the will. The Supreme Court refused to address the factual sufficiency question because that was
within the sole purview of the court of appeals.

 Charles Neville and Knapp point to the following language in the Lee opinion: 

 Since there is no direct testimony in the record of acts, demeanor or condition
indicating that testator lacked testamentary capacity on October 2, 1961, testator's
mental condition on that date may be determined from lay opinion testimony based
upon the witnesses' observation of testator's conduct either prior to or subsequent to
the execution.


Id. at 424 S.W.2d 609. They posit that evidence about a testator's mental condition before or after
the signing of the will may be given probative effect only if there is no direct evidence of the
testator's mental soundness on the actual date the will was executed. We disagree.

 We do not believe the Supreme Court meant to say in Lee that it is only when there is no
direct evidence of the testator's mental soundness on the date the will was actually signed that
evidence of the testator's mental condition on other dates may be used. Instead, we believe the court
was saying that although there was no direct evidence of the testator's mental condition on the date
of execution, the jury's verdict could still be sustained by the evidence about Lee's mental soundness
on the other dates before and after the will's signing. This has been the rule in Texas for many years 
and is confirmed by the Texas Supreme Court's decisions in Croucher v. Croucher, 660 S.W.2d 55
(Tex. 1983), and Carr v. Radkey, 393 S.W.2d 806 (Tex. 1965), where probative effect was given to
evidence of the testator's mental soundness on both the date of the execution of the will and at times
prior to the date the will was executed. It has always been the rule in Texas that, although the proper
inquiry is whether the testator had testamentary capacity at the time he executed the will, the court
may also look to the testator's state of mind at other times if those times tend to show his state of
mind on the day the will was executed. Evidence pertaining to those other times, however, must
show that the testator's condition persisted and probably was the same as that which existed at the
time the will was signed. Whether the evidence of testamentary capacity is at the very time the will
was executed or at other times goes to the weight of the testimony to be assessed by the fact finder. 
See Croucher v. Croucher, 660 S.W.2d 55; Carr v. Radkey, 393 S.W.2d 806; Bracewell v.
Bracewell, 20 S.W.3d 14; Horton v. Horton, 965 S.W.2d 78, 85 (Tex. App.-Fort Worth 1998, no
pet.).

 Moreover, there is evidence in the form of expert opinions from two doctors who testified
that Verdie Neville had a brain tumor that adversely affected her mental soundness, that it was
getting progressively worse before the execution of the July 9, 1998 will, and that in their opinions
it deprived her of testamentary capacity. One of the doctors, Dr. Nathan Wright, who was Verdie
Neville's regular physician, testified that in his opinion her condition was such that it continued to
deteriorate and that she did not have testamentary capacity on July 9, 1998, when she signed the will.
Dr. Patterson, a neurosurgeon who performed surgery on Verdie Neville, testified that when he
discharged her on June 26, 1998, he thought it highly unlikely that she was able to understand the
business  associated  with  executing   a  will  and  that  her  condition  would  continue  to
deteriorate. Dr. Patterson testified there was some question in his mind as to whether Verdie Neville
understood everything involved when she signed a consent to treatment from him, that her brain
tumor affected her ability to transact business, and that her condition would continue to deteriorate. 
He examined her on June 26, 1998, and testified he thought it highly unlikely that she had the ability
to understand the business associated with executing a will. Dr. Patterson's last contact with Verdie
Neville was about two weeks before she signed the July 9, 1998 will.

 We are left, then, with the application of these facts and these well-settled principles to
determine the legal and factual sufficiency of the evidence to support the trial court's findings.

 We first look at the evidence tending to support the court's finding that Verdie Neville did
not  have  testamentary  capacity  on  July  9,  1998.  Dr.  Wright  testified  that  when  he  saw  her
on June 3, 1998, she was complaining of short-term memory loss over the previous two months and
that she had been diagnosed with a malignant brain tumor. He testified that she had difficulty
deciding what words to use, she forgot where she had left items, and she would sometimes reverse
sentences when speaking. He testified that her prognosis was for a progressively worsening
dementia and that at the time of her visit, her mental capabilities were diminished. He also testified
that based on a reasonable medical probability, she did not have the mental capacity to execute a will
one month later, on July 9, 1998.

 James Verschoyle, the attorney who prepared a prior will for Verdie Neville, testified that
he refused to draft the new will signed on July 9, 1998, because he did not think she was competent. 
He also testified that he believed she was not of sound mind. 

 Larry Neville, Verdie Neville's nephew, worked for his aunt and testified that she began
having difficulties with her memory and decision making around September 1997, and that based
on his observations in June and July 1998, he believed she did not have the mental capacity to make
an informed decision. Two granddaughters testified that they visited Verdie Neville in June and July
1998, and they believed she was not mentally cognizant at that time. 

 Byron Terry was a business partner of Verdie Neville, and he witnessed another will she
signed on April 1, 1998. He testified that he wanted his name "off that will" because he did not
believe she was competent at that time. He also testified that he thought Verdie Neville was not
competent to make a will "in July 1998." Terry, however, took a deed from Verdie Neville, which
she signed on July 1, 1998, that partitioned some property they jointly owned.

 Barbara Skelton, a neighbor, testified that she saw Verdie Neville regularly for the last month
of her life, from June 14 until July 15, that Neville was not coherent all the time and did not have
decision-making ability, and that she believed Verdie Neville did not have the ability to understand
the effect of her actions or the general nature and extent of her property. 

 This clearly constitutes some evidence to support the trial court's determination that Verdie
Neville was not competent when she signed the July 9, 1998 will. The remaining question is
whether this evidence is overridden by the great weight of the contrary evidence. 

 Charles Neville, Verdie Neville's son, testified that he was a witness to the July 9, 1998 will,
and that on that day his mother was capable of conducting business transactions and was aware of
her property and estate, that she had discussed her assets, met with her bankers, and executed a deed
just before she signed the will. 

 Tonya Qualls, a notary public, testified that Verdie Neville was in her recliner and pretty
much alert on the day she signed the July 9, 1998 will; that Charles Neville did not participate in the
will signing; that Verdie Neville told her attorney, Edwin Buckner, that she wanted Charles Neville
to have everything; and that she was responsive to Qualls' conversation, knew she was making a will,
and understood its effect. 

 Katy Griffin, a college student who witnessed the will, testified that she thought Verdie
Neville knew what she was doing when she signed the will.

 Anna Rickart, a nurse, testified that she sat with Verdie Neville and that Neville was able to
feed herself, was able to talk about what she wanted to eat, and Rickart knew of no reason why
Verdie Neville would not be able to conduct business. 

 Faye Clayton, a retired employee of Guaranty Bank and a friend of Verdie Neville, testified
that she visited with Neville about Neville's accounts in June 1998, and that Neville had no apparent
mental incapacity at that time.

 Sandra Hall, a branch manager of Guaranty Bank, testified that she visited with Verdie
Neville in her office at the bank on June 22, 1998, that at that time Verdie Neville was able to
transact business and carry on an intelligent conversation, and that on July 1, 1998, she and Verdie
Neville discussed changing Neville's will. 

 Don Sewell was a witness to the will. He testified that he talked with Verdie Neville and that
she was lucid, appeared to have clear thought patterns, and clearly stated that she intended to leave
her entire estate to her son, Charles Neville. He believed Neville was competent and coherent. 

 Doris Fitts, a friend of Verdie Neville, testified that she visited with her until two days before
Neville's death and that Neville was able during that time to understand her business transactions and
"knew what she was talking about." 

 Sylvia Styles, a sitter hired to stay with Verdie Neville, testified that Neville was able to
converse and specify the foods she wanted to eat, that Neville was "real alert" just before her death,
and that she felt Neville was competent until the time she died. 

 From this recitation of the testimony, it is clear that the evidence is conflicting. In such a
situation, the trier of fact is entitled to accept or reject any testimony, resolve conflicts in the
testimony, and decide the weight to be given to the testimony. On this record, we cannot say that
the evidence is factually insufficient to support the trial court's finding or that the trial court's finding
is against the great weight and preponderance of the evidence.

 We affirm the trial court's judgment.


 William J. Cornelius

 Chief Justice


Date Submitted: January 3, 2002

Date Decided: January 30, 2002


Publish



 style="font-family: 'Times New Roman', serif">            In determining a no-evidence issue, we are to consider only the evidence and inferences that
tend to support the finding and disregard all evidence and inferences to the contrary. Bradford v.
Vento, 48 S.W.3d 749, 754 (Tex. 2001); Cont'l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450
(Tex. 1996). Anything more than a scintilla of evidence is legally sufficient to support the finding. 
Cazarez, 937 S.W.2d at 450. When considering a factual sufficiency challenge to a jury's verdict,
courts of appeals must consider and weigh all of the evidence, not just that evidence which supports
the verdict. Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998). A court of appeals can
set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the
verdict is clearly wrong and unjust. Id.; Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). 
            Smith provided evidence that the fence was on the boundary line determined by a surveyor
in 1973 when Smith's predecessor in title (his father) had purchased the property. The fence was on
that line in 1986, and the evidence was that, when Smith replaced the fence in 1997 he put it exactly
where it had been before. After this dispute arose, Hampton again surveyed the property in
September 1999 at Smith's request. He testified that, based on his review of the deeds and the
property, the boundary line shown by the fence was correct. He also acknowledged the dispute about
the location of this property line, which was based on a disputed call in a 1932 deed conveying a
piece of property to the east of these tracts. There was also a disparity between the amount of
acreage set out in Jones' deed and the actual acreage. However, even if the fence was placed as Jones
urged, his total acreage would be less than as provided in his deed. 
            Hampton also acknowledged that surveys done by the previous surveyor, Mr. McClelland,
were inconsistent. McClelland's 1961 survey had set out one property line, but McClelland changed
that survey in 1973 to reflect the current location of the line at issue. Hampton testified he found
nothing on the ground to support the 1961 location, but did find pins to support its present location. 
Hampton also testified that the changed location of the line made the mathematical calculations for
the amount of land stated in the deed to Smith correct—calculations for the previous line resulted
in fewer acres than were set out in the deeds going back through the decades. Hampton was also
questioned about the deed transferring ownership to Jones and noted that the tract was described in
terms of acreage instead of boundary descriptions. 
            Jones testified he lived on the property until 1944 and took care of it after his parents died. 
He became aware of the new fence in 1999 and testified that it was in a different location than he
remembered. He based that belief on his memories from fifty-five years earlier, which was the last
time he had been on the northern boundary of the property, and on a measurement he took from a
call set out in the deed to an adjoining piece of property. Jones' father sold a forty-acre tract to Leon
Ford in 1932. Jones believes the property line he shares with Smith is approximately 150 feet north
of the line established by the survey. He came to this conclusion based on a reference to a 480 varas
call in the 1932 deed to Leon Ford's property, which adjoins his property. It is his belief that Ford's
west boundary line is coextensive with his east boundary line. He testified that, after converting the
480 varas measurement to feet, he then measured the distance and moved the fence accordingly. 
            The evidence in favor of the verdict, as set out above, is legally sufficient to support the
verdict. Considering all of the evidence as summarized above, although there is conflict to be
resolved, it does not appear that the fact-finder reached its verdict against the great weight and
preponderance of the evidence.
2.         Use of a declaratory judgment in granting relief
            Jones next contends that the court erred by rendering the judgment in the form of a
declaratory judgment, because that remedy has no application here, and because this is in the nature
of a trespass to try title claim. He further argues the monetary awards linked to that cause of action
must, therefore, be deleted.
            This judgment was rendered, in part, as a declaratory judgment. Boundary disputes are not
amenable to declaratory judgment. Martin, 133 S.W.2d 262. Based on the Martin case, Smith
acknowledges that the attorney's fees and damages awarded are improper. That contention of error
is meritorious, and we reform the judgment to delete those awards. 
3.         Failure to abate the case due to nonjoinder of other cotenant
            On the day before trial, Jones filed a motion asking to abate the case because Smith had not
joined all necessary and indispensable parties. Jones alleges that he is one of several cotenants of
the property and argued that they are necessary parties to the suit and that the cause should, therefore,
be abated. 
            This issue is directly controlled by Tex. R. Civ. P. 39.


 The determination of whether to
proceed in the absence of such a party is a discretionary decision for the trial court. Clear Lake City
Water Auth. v. Clear Lake Utils. Co., 549 S.W.2d 385, 389–90 (Tex. 1977); Allegro Isle Condo.
Ass'n v. Casa Allegro Corp., 28 S.W.3d 676, 678 (Tex. App.—Corpus Christi 2000, no pet.); MCZ,
Inc. v. Smith, 707 S.W.2d 672, 675 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e). A trial
court abuses its discretion when it rules arbitrarily, unreasonably, without regard to guiding legal
principles, or without supporting evidence. Bocquet v. Herring, 972 S.W.2d 19, 21 (Tex. 1998).
             Smith brought this lawsuit because Jones disputed the location of the boundary line, moved
a portion of the fence, and thereby "placed a cloud" on his title to the property. As pointed out by
Smith at the hearing, Jones is the only one of the cotenants who had indicated any disagreement
about the location of the boundary. Smith also acknowledged that he wanted to proceed with the
lawsuit and that he might have to repeat the action against the other coowners if they chose to raise
similar claims.
            The rules of joinder provide that a person shall be joined as a party in the action (1) if, in his
or her absence, complete relief cannot be accorded among those already parties, or (2) if he or she
claims an interest relating to the subject of the action and is so situated that the disposition of the
action in his or her absence may, as a practical matter, impair or impede his or her ability to protect
that interest or leave any of the persons already parties subject to a substantial risk of incurring
double, multiple, or otherwise inconsistent obligations by reason of his or her claimed interest. 
Under the language used in the rule, it is clear that none of the other cotenants had "claimed an
interest" in the portion of the property in dispute in this suit. 
            The Texas Supreme Court has specifically stated that it would be rare indeed if there were
a person whose presence was so indispensable that his or her absence deprived the court of
jurisdiction to adjudicate between the parties already joined. Cox v. Johnson, 638 S.W.2d 867, 868
(Tex. 1982); Caldwell v. Callender Lake Prop. Owners Improvement Ass'n, 888 S.W.2d 903, 907
(Tex. App.—Texarkana 1994, writ denied).
            Even more recently, in the context of a declaratory judgment and a suit brought by members
of a homeowner's association, the court held that the failure to join other landowners in a subdivision
property owner's action against a homeowners' association did not deprive the trial court of
jurisdiction, and returned the case to this Court for consideration of the remaining issues. Simpson
v. Afton Oaks Civic Club, Inc., 145 S.W.3d 169 (Tex. 2004). The court applied the analysis that it
used in Brooks v. Northglen Ass'n, 141 S.W.3d 158 (Tex. 2004), in which it held that a declaratory
judgment action against a property owners' association would not prejudice the rights of the other
property owners because unjoined owners would not be bound by the suit, noting that nothing
prevented the trial court from rendering complete relief to those parties before it, and if the
homeowners' association were exposed to multiple suits, that was the result of its own inaction.
            We also note that the motion to abate and join new parties was filed the day before trial,
when the information necessary to pursue the motion had been known since the suit had been filed
a year earlier. See Akinwamide v. Transp. Ins. Co., 147 S.W.3d 623 (Tex. App.—Corpus Christi
2004, no pet.) (finding that a trial court did not abuse its discretion by denying a motion to join
additional parties seventeen days before trial, which would surely have required postponing the trial).
Trial courts are guided by Rule 37 of the Texas Rules of Civil Procedure when deciding whether to
allow the joinder of another party at a time which would unreasonably delay the trial of the case. See
Tex. R. Civ. P. 37.



            We conclude that the court did not abuse its discretion by denying the motion to abate.
 4.         Failure to rule on Jones' motion for sanctions for discovery abuse and motion for
summary judgment

            Jones next contends the trial court erred by failing to impose sanctions on Smith for
discovery abuse and for failing to rule on Jones's motion for summary judgment.
            Jones' argument is: if sanctions had been imposed keeping Smith from entering his deeds
into evidence, Jones would have prevailed at trial, and the sanctions could also have resulted in the
court granting his motion for summary judgment.
            Jones filed both motions October 8, 2003, and he states in his brief that he requested a setting
on them. Smith argues that Tex. R. App. P. 33.1 controls in this case, because Jones never sought
to obtain a ruling on either motion. 
            The Texas Supreme Court has directed that "the failure to obtain a pretrial ruling on
discovery disputes that exist before commencement of trial constitutes a waiver of any claim for
sanctions based on that conduct." Remington Arms Co. v. Caldwell, 850 S.W.2d 167, 170 (Tex.
1993); Martin v. Commercial Metals Co., 138 S.W.3d 619, 623 (Tex. App.—Dallas 2004, no pet.). 
This is in accord with the general rule that, as a prerequisite to a complaint for appellate review, the
record must show that the trial court, either expressly or implicitly, ruled on the motion. Tex. R.
App. P. 33.1(a)(2)(A). Thus, similarly, the failure to obtain a ruling on the motion for summary
judgment has not preserved any error for our review. The contention of error is overruled.
            We reform the judgment to delete the monetary awards made pursuant to the declaratory
judgment, and otherwise affirm.
            Rule 43.4 provides that a court of appeals should award costs to the prevailing party. Tex.
R. App. P. 43.4. In this case, no party prevailed on all of the principal issues. We, therefore,
apportion the costs between the parties. See, e.g., City of Austin v. Capitol Livestock Auction Co.,
453 S.W.2d 461, 465 (Tex. 1970); Burke v. Union Pac. Res. Co., 138 S.W.3d 46, 75–76 (Tex.
App.—Texarkana 2004, pet. granted) (op. on reh'g). Costs are apportioned at one half to each party.
 

                                                                        Jack Carter
                                                                        Justice
 
Date Submitted:          January 20, 2005
Date Decided:             February 9, 2005